PLUMMER (CONNECTICUT MUT. LIFE INS. CO. v.). See Case No. 3,106.

PLUMMER (GILPIN v.). See Case No. 5,-451.

———

## Case No. 11,233.

### PLUMMER v. WEBB.

[4 Mason, 380.] [1]

Circuit Court, D. Maine.  May Term, 1827.

ADMIRALTY—SUIT FOR ABDUCTION OF MINOR SON — VALUE OF SERVICES — MARITIME CHARACTER OF CONTRACT.

1. A father may maintain a suit in the admiralty for a tortious abduction or seduction of his minor son on a voyage on the high seas, in the nature of an action per quod servitium amisit, for it is a continuing tort.

[Cited in Waring v. Clarke, 5 How. (46 U. S.) 486; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 434; The Yankee v. Gallagher, Case No. 18,124; Cutting v. Seabury, Id. 3,521; Hough v. Western Transp. Co., 3 Wall. (70 U. S.) 34; The Florence, Case No. 4,880; The Charles Morgan, Id. 2,618; The Garland, 5 Fed. 926.]

[Cited in Magee v. Holland, 27 N. J. Law, 95.]

2. A father is entitled to the services of his minor children.  And he may sue in the admiralty for wages earned by such children by maritime services.

[Cited in The Etna, Case No. 4,542; The Hattie Low, 14 Fed. 880; The Modoc, 20 Fed. 399.]

[Cited in Guion v. Guion, 16 Mo. 50; Halliday v. Miller, 29 W. Va. 431, 1 S. E. 827.]

3. A contract of a special nature is not cognizable in the admiralty merely because the consideration of the contract is maritime service. The whole contract must, in its essence, be maritime, or for compensation for maritime services.

[Cited in Waterbury v. Myrick, Case No. 17,-253; The Perseverance, Id. 11,017; U. S. v. New Bedford Bridge, Id. 15,867; Leland v. The Medora, Id. 8,237; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 421; Gloucester Ins. Co. v. Younger, Case No. 5,487; Grant v. Poillon, 20 How. (61 U. S.) 168; The G. H. Starbuck, Case No. 5,378; The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 142; Diefenthal v. Hamburg-Amerikanische P. Actien-Gesellschaft, 46 Fed. 399.]

[Cited in Case v. Woolley, 6 Dana, 21.]

Libel in the admiralty in personam.  The allegations in the libel stated, that the infant son of the plaintiff [Moses Plummer] was shipped, with the consent of the plaintiff, on board of a vessel of which the defendant [Michael Webb] was master, on a certain voyage described in the libel, and proceeded to

[1] [Reported by William P. Mason, Esq.]

give an historical detail of certain gross misconduct, ill usage, and cruel treatment, on the part of the master, towards the son of the plaintiff; that his health was impaired thereby; and that he was improperly carried away on a second unauthorized voyage, beyond the scope of the original shipping articles, during which he died.  Many aggravations were alleged in the libel as grievances, and damages were prayed accordingly.  The district court, upon the hearing of the cause, dismissed the libel upon the merits.  [Case No. 11,234.]  Upon the appeal to the circuit court, an objection was taken to the jurisdiction of the district court as a court of admiralty to entertain the suit.  [Case unreported.]  It was also suggested by the court, that the allegations in the libel savoured of felony, and seemed to charge the defendant with an offence of a very heinous nature.  By the leave of the court the libel was amended in this particular, and came on to be heard upon the question of jurisdiction.

Messrs Daveis and Greenleaf, for libellant. Mr. Orr, for respondent.

STORY, Circuit Justice.  When this case was formerly before this court a doubt was suggested on my part, whether the case, as laid, did not assume the character of a criminal and felonious offence; and if this objection was overcome, whether it was a case within the admiralty jurisdiction.  In consequence of this suggestion the original libel was amended, with a view to get rid of the objection as to the criminal nature of the complaint; and at the last term of the court, the question, as to the admiralty jurisdiction, was, at my instance, fully argued by counsel. Some of the sources of my doubt were entirely removed at the argument; and so far as any one yet remains, it arises rather from the particular frame of the libel, than the case as argued at the bar.

The suit is brought by the libellant for damages occasioned by the loss of the services of his infant son through the misconduct of the respondent, the master of the brig Romulus, on board of which vessel the son was, with the consent of his father, shipped for a foreign voyage.  The case has been argued merely on the allegations contained in the libel; and of course nothing of its real merits is to be understood as in controversy in this stage of the proceedings.  There are two distinct allegations, or as they are phrased at the common law, two distinct counts in the libel.  The first asserts, that the libellant entered into an agreement, that his son, who was under 14 years of age, and to whose services he was entitled, should go "on a voyage to sea within the jurisdiction of the court, on board the Romulus, of which the respondent was master, to Europe and home, for good, careful, tender, and paternal usage, suitable to his years and station, and for his improvement, according to his ability and

capacity, in order to render his services more useful and valuable to the libellant," and that the respondent assented to the agreement on his part. It then asserts, that the son went on the voyage accordingly, and proceeded from Portland to Savannah, thence to Liverpool, and from Liverpool to New Orleans; and that, during all this period, the son did duty on board, and rendered such services as he was able; that during this voyage the respondent suffered the son to be beaten in an excessive and improper manner, by the mate of the brig, on divers occasions, and put him in the mate's watch, and knowingly exposed him to inhuman treatment and abuse; that, after the arrival of the brig at New Orleans, the crew were discharged, and the son, finding that the brig was not to return to Portland, but to go on another voyage, solicited permission to return home, which the respondent, from improper motives, refused, and compelled him to remain on board, and to pursue the new voyage; that the vessel sailed on that voyage for Europe; and that the son, by reason of this ill usage, was much debilitated, and finally, in the course of the passage, sickened and died; whereby all his services were lost to the libellant.

The second count sets forth a like agreement, with the additional fact, that the son was to serve without wages. It then proceeds to state, in substance, the same facts and acts of misconduct and ill usage, as in the first count, and the carrying away of the son on the second voyage, without authority, and his sickness and death; and that "thereby the libellant wholly lost the service, comfort, and society, of the son, after said conversion, and evermore."

There is no doubt of the right of a father to the services of his children during their minority. It results at once from the parental duty and obligation to maintain them, and from the deep interest, moral, religious, and social, which the parental relation necessarily involves in the comfort, happiness, and preservation of offspring. It is accordingly laid down in our text-books, that a father is entitled to the advantages and profits accruing from the personal labour of his children, while they live with and are maintained by him. 1 Hoodeson, Seel. 451, 452; 1 Bl. Comm. 452, 453. And if they are, by force or fraud, by abduction or seduction, withdrawn from his power or protection, so that he loses the comfort of their society, or their services, he is entitled by the common law, upon the plainest principles of justice, to an action of damages for the tort, per quod servitium amisit. The authorities are clear to this purpose, and go even to the extent, that the tort may be waived, and an action, as ex contractu, maintained for the child's services. See Selw. N. P. tit. "Master and Servant," I, IV: Hambly v. Trott, Cowp. 375; Lightly v. Clouston, 1 Taunt. 112; Foster v. Stewart, 3 Maule & S. 191; 5 East, 39, note;

James v. Le Roy, 6 Johns. 274; Hill v. Allen, 1 Ves. Sr. 83; Winsmore v. Greenbank, Will. 577. In respect to the right of a father to sue in the admiralty for the wages of his minor son, or for a master to sue for the wages of his apprentice, for services on a maritime voyage, there cannot, I presume, be the least reason for judicial doubt; at least, if there be, it is not entertained by this court. The case of Emerson v. Howland [Case No. 4,441] is directly in point, and binds my judgment.

The real difficulty in sustaining the jurisdiction, in the present case, stands wholly free from these considerations. Supposing the present libel to be for a tort, in the nature of an action for damages for an abduction or seduction, per quod servitium amisit, the only question would be, whether it was a tort arising upon the high seas. The most strenuous opponents of the admiralty, those, whose zeal in favor of the exclusive pretensions of the courts of common law, does not hesitate to adopt any doctrine on this subject, however extravagant, which is countenanced by a single authority or dictum, have been compelled to yield, that the admiralty has jurisdiction over torts committed on the high seas. Lord Coke has, in the most positive form, asserted it in his 4th Institute, 134, in behalf of the common law judges. "We acknowledge (says he), that of contracts, pleas, and querels, made upon the sea, or any part thereof, which is not within any county (from whence no trial can be had by twelve men), the admiral hath, and ought to have, jurisdiction. And no precedent can be showed, that any prohibition hath been granted for any contract, plea, or querele, concerning any marine cause, made or done upon the sea, taking that only to be the sea, wherein the admiral hath jurisdiction, which is before by law described to be out of any county." And this language conforms to the interpretation of the statutes of 13 Rich. II. c. 5, and 15 Rich. II. c. 3, for which the common law courts have contended, with so much resolution and success in other times. Mr. Justice Blackstone also, in his Commentaries (volume 3), 68, 107, admits the jurisdiction of the admiralty over maritime injuries, in the most ample terms. See Martins v. Ballard [Case No. 9,175].

Looking at the libel under this aspect, the only part of it, which lays any foundation for the jurisdiction of the court, is the seduction or abduction of the son on the second voyage from New Orleans to Europe; for as to the first voyage from Portland, there is no pretence of any unlawful retainer. The only objection, which can fairly be made to the jurisdiction, under these circumstances, is, that the unlawful act had its origin in port, and may be redressed at the common law. But in respect to maritime torts, with the exception of cases of prize, the courts of common law have constantly claimed a right of concurrent jurisdiction, and the exercise of

it has never been supposed to oust the admiralty of its authority to entertain suits of the like nature. Here, it is true, the tortious act, or cause of damage, might be properly deemed to arise in port; but it was a continuing act and cause of damage during the whole voyage. It was, in no just sense, a complete and perfected wrong, until the departure of the vessel from port; and it travelled along with the parties as a continuing injury through the whole voyage, and terminated only with the death of the son at sea. In Com. Dig. "Admiralty," F 5, it is laid down, that if the libel be founded upon one single continued act, which was principally upon the sea, though part was upon land, a prohibition will not go. And for this he cites 1 Roll. Abr. 533, line 13, where it is said, if a man take a thing upon the sea, and bring it to land, the suit for that may be in the admiral court, for it is a continued act. This is now common learning; for no suits are more frequent in the admiralty, than those for restitution for marine trespasses to property. The present case appears to me to fall precisely within the principle stated by Comyns. I think it, however, unnecessary to go into an examination of the doctrine at large, because the reasoning which supports it has been fully considered in the opinion of the district judge, in the case of Steele v. Thacher [Case No. 13,348], at December term, 1825, with a copy of which I have been favored. I take this opportunity of expressing my entire concurrence with the learned exposition given by him, on that occasion, of this branch of the admiralty jurisdiction.

The real difficulty which I have felt, in regard to the jurisdiction of the court, arises from another aspect of the case, as founded in contract. The libel, so far as it seeks damages for the misconduct of the master on the first voyage (in which there was a lawful retainer), seems to proceed upon a breach of the contract set forth in the first count. The contract is not set forth as mere inducements to the tortious conduct, but it is laid as the very gist of the suit. The gravamen is the breach of the terms of the contract, and the violation of duty which flowed from its obligations. It does not, indeed, seek a compensation for services, in the nature of wages; for no such compensation was within the scope of the contract. But it does seek compensation for positive or permissive violations of the agreement "for good, careful, tender, and parental usage." Now, my doubt is, whether a special contract, like that articulated in the libel, is of such a nature as properly falls within the admiralty jurisdiction. My opinion, upon the most careful examination which I have been able to give the subject, has hitherto been, that of right the admiralty possessed jurisdiction over all maritime contracts. In arriving at this conclusion it has been necessary to examine the decisions of the courts of common law, with critical care, and to compare them with each other, as well as with general principles. If, indeed, every decision, made by a court of common law, and every dictum of an English judge, on the subject of this jurisdiction, is to be deemed to be an absolute authority, infallible and irreversible, and conclusive upon the conscience of every American court, the course is very easy to establish what are the actual, though arbitrary limits prescribed to the admiralty. But if the subject is to be investigated upon principle; if opinions, held by these who were not only jealous of, but hostile to, the fair exercise of the jurisdiction, are to be sifted; if decisions, hastily made upon applications for prohibitions, during the vehement struggles of those rival courts, or, as one may say, flagrante bello, are to be calmly and deliberately considered; if adjudications, made at one period, are to be weighed with conflicting adjudications, made at another period; if the reasoning of cases is to be brought under discussion, and thus, non numerantur, sed penderantur; if, above all, the voice of those enlightened and learned judges, who have adorned the admiralty in different ages, and whose knowledge and experience are not cast into shade by a comparison with the ablest of their contemporaries, may not be stifled without a hearing; it will not be found quite so facile a task, as is sometimes rashly imagined, to convict the admiralty of gross usurpations, or to sustain the courts of common law in all their irregular and fluctuating restrictions upon that jurisdiction. Nor can there be any just cause of alarm to any considerate mind in the exercise of jurisdiction over maritime contracts. Courts of admiralty act within the sphere of their jurisdiction, as courts of equity, and administer justice ex æquo et bono. No objection lies against them, which does not equally lie against courts of equity. There is no real danger, in either case, to private or personal rights, unless the administration of substantial equity between the parties is to be deemed injustice. Of all contracts none require so liberal an interpretation, so enlarged a good faith, and so comprehensive an equity, as maritime contracts. And it is one of the highest excellencies of the common law courts, that, since maritime contracts have come familiarly under their cognizance in modern times, they have endeavored to give them an expansive equity, and to disentangle them from the niceties of the old technical law. No man could wish to see those courts deprived of any portion of this jurisdiction, which is now exercised by them with such beneficial and important influences upon society. But it is a very different question, whether another court is to be deprived of an ancient concurrent jurisdiction, always claimed by it as a matter of right, and always exercised by it, until borne down by a torrent of prohibitions. My opinion, as to the matter of right, remains unaltered. Whenever it shall be established,

in a higher tribunal, that a different rule ought to prevail; that the admiralty jurisdiction in America ought to be measured, not by the powers of the colonial vice admiralty courts, nor by the doctrines of admiralty judges, but by the decisions of the courts of common law upon prohibitions to the high court of admiralty in England; I shall cheerfully bow to the judgment, and submissively obey the mandate. Whatever may be my own private judgment on these matters, there ought to be no wish to contend for the exercise of powers, which involve irksome and laborious duties, and, least of all, to covet a jurisdiction which is so ably administered elsewhere. I may not be convinced, that there ought to be a surrender of the right, because its free exercise has been interrupted in other times, or a conjectured public policy requires its abandonment; but I shall resign myself to a perfect acquiescence in any judicial result which other minds may dictate.

To return, however, to the point more immediately under consideration, the difficulty is in affirming this contract to be solely and exclusively a maritime contract. It seems rather to be a temporary apprenticeship for the voyage, and not otherwise a maritime contract, than that the sea was, by implication, to be the principal scene for its performance. So far as the services of the boy are concerned, these services are principally maritime; but they constitute, not the ground of the present claim, but the consideration for the stipulations of the master for paternal and proper usage. If this case had been upon common indentures of apprenticeship, though for the purpose of learning the mystery of a mariner, I should have had great doubt, whether the apprentice could sue for a breach of the stipulated duties by the master in the admiralty. I cannot say, that the whole contract is here of a maritime nature. There is mixed up in it obligations ex contractu not necessarily maritime; and so far the contract is of a special nature. In cases of a mixed nature it is not a sufficient foundation for admiralty jurisdiction, that there are involved some ingredients of a maritime nature. The substance of the whole contract must be maritime. If the doctrine of the courts of common law, which denies the admiralty jurisdiction over mariners' contracts, where there is a special agreement, had been confined to cases, where the consideration for such maritime services was not money, but of a peculiar nature, not capable of adjustment in pecunia numerata, or resting in special executory stipulations, there would have been little objection to it. See Howe v. Napier, 4 Burrows, 1944; De Lovio v. Boit [Case No. 3,776]; Harden v. Gordon [Id. 6,047]. If a contract were to convey a farm or a house, or to build a mill, or to furnish manufacturing machines, or to weave cloth, in consideration of marine services, it would hardly be contended, that a court of

admiralty had authority to enforce these special stipulations. In such a mixed contract the whole would most appropriately belong to a court of common law. After considerable reflection on the subject, I have not been able to persuade myself, that a contract "for good, careful, kind, tender, and parental usage," in consideration of marine services, upon a special retainer without wages, is properly cognizable in an admiralty forum. I have no desire to strain the jurisdiction, so as to reach cases of an ambiguous character. Let them be left to the common forum of the litigant parties. See L'Arina v. Manwaring [Id. 8,089].

Upon the whole, as at present advised, I incline to the belief, that the case, so far as it stands upon the first voyage, cannot be supported in this court, and that it ought to be dismissed, without prejudice to any suit in a common law tribunal. What would be the case upon a suit for ill usage by the minor himself, if living, it is unnecessary to consider, as no such case is before the court for judgment, and sufficient unto the day is the evil thereof.