'Chief Justice Robertson
delivered the Opinion of the Court.
A. R. Woolley — whose slave, named William Gordon, had, without his consent, been taken (in violation of the statutes of this State, of 1824 — 1 ¡Stat. Law, '259 — 60,) on hoard the steam boat Lancaster, from Louisville in Kentucky, the place of his residence, to New Orleans, whence he 'had fled to some place unknown, so as to have escaped, vigilant search and enquiry after him— proceeded, by bill in chancery in the Chancellor’s Court for the said city of Louisville, to attach the said boat, for the purpose of subjecting it to the lien 'given by the •said statutes, for the damages which he had sustained.
Wilson W. Hinkle, who was made a defendant, admitted that he was owner of the boat at the time of the alleged abduction, hut averred that .one Grooms was •master, and in receiving William Gorden on. board, as a freeman, had acted without his knowledge or authority. And it appearing that Charles H. Henshaw — who had bought the boat at New Orleans, under an order of sale by the Judge of the United Státes Court for the eastern district, of Louisiana, made between the abduction of the slave and the filing of the bill, on the libel of Joseph Reed, as clerk for said boat, and upon other intervenient *18 •libels, for supplies furnished to it, by other libellants, at New Orleans, and for other demands, against it, — had sold one fourth thereof to said Reed, and one fourth to Loyal Case, and one fourth to Theodore Segond: Reed and Case, upon their petition, were made defendants, and thereupon replevied the boat, and having thus obtained restitution of it, from the officer who had attached it, in obediance to -the chancellor’s order in this case, answered! the bill, and relied for defence, on the purchase by Henshaw, without notice of Woolley’s lien, given by the statutes before referred to, and upon their -own purchase, without'notice, from Henshaw.
To a bill to enforce a lien, all -the owners of the pledge should he parties. But where — in a suit inrem — the property was restored to certain claimants, upon bond, and the subsequent proceedings were inpersonamonIy, those dof’ts can take no advantage of the omission to make •other owners parties; they should themselves have made them parties, if their interest required it.
Questions stated ■&e.
The chancellor, being of the opinion that Woolley was ■ entitled to damages, and also to an available lien on the •steam 'boat Lancaster, notwithstanding the decree and sale in Louisiana, and a jury, empannelled for that purpose, having fixed the amount of damages at one thousand dollars — decreed that Iiinkle, Reed and Case should pay that sum and the costs of the suit.
The object of this appeal is to reverse that decree,, upon various grounds assigned for error.
I. The appellants contend that Henshaw ought to have been made a party by the .appellee; and certainly he would have been a necessary party had there been no release of the lien on the boat by the substitution of the bond of the appellants, Reed and Case, and had there been any final proceeding in rem, or otherwise affecting his interest. But as the decree was only in personam against Hinkle, on his original liability for his unlawful acts, and against Reed and Case inconsequence of their bond given voluntarily, in consideration of their claim of interest in the boat — we are of the opinion that Henshaw was not an" indispensable party, and that, if it was material -to the appellants that he should have been made a party, it was their duty, and not that of the appellee, to bring him before the Court.
II. The next ground taken by the appellants in opposition to the decree, applies to Reed and Case alone; -and is, that, though there is no proof that they were purchasers for a valuable consideration, or had paid any thing for their interest in the boat prior to notice of the *19 appellee’s lien, nevertheless, Henshaw, of whom it is ad1 mitted that they bought one fourth part each, was such a purchaser as to be entitled to hold the boat unincumbered by ’that lien; and that therefore, as, upon that hypothesis, a decree against Henshaw, had he been a party, woijld have been erroneous, the chancellor had no right to render a decree against them, on the ground of Their derivative claim. To this, the appellee replies: first — that Henshaw had implied notice of the lien before he had paid the consideration; and, second — that the District Court of Louisiana had no jurisdiction; and that the sale to Henshaw was therefore void. These points ivere thus- decided by the chancellor, in an elaborate opinion, in which he endeavored to sustain each of therp by ^imposing argument and the array’of much supposed authority. But, after giving the most respectful .consideration to the arguments of the chancellor, and to the cases cited in his learned opinion, we cannot concur with him in his conclusion respecting either of those •two points.
Aetual notice ter the master, of a boat, of a liem upon it, by the service of a process of sequestration, is comstructive notice to the owners. And, tho’ they may have purchased after the aceruel of the lien — so far as tho purchase money remains unpaid, at the time of the service of the process, they will be as much bound by that notice, as they would have been by notice before their purchase. Yet, if they were purchasers under a valid decree, in favor of creditors, who had no notice of the lien, as those creditors would not be bound by it, and the purchasers under their decree, would be’subrogated to their rights, those purchasers would-. ,not be affected by the lien, or any notice they may have had of it.
First — as to the notice. Although we concur with the chancellor in the opinion that actual notice to -the master of the boat, by the.service of process upon it, was constructive notice to Henshaw, as the owner, or one of several owners, and although we also concur with him in the opinion that notice thus given, when,,of the price agreed to be paid by Henshaw for the boat,, as much as the amount of the appellee’s claim remained unpaid, was as effectual, so far as his lien was concerned, as the like notice before the sale under the Louisiana decree — nevertheless,, if that decree was valid, we are of the opinion that, according to the principle settled by this Court, in the case of Helm vs. Logan’s Heirs, 4 Bibb, 78, unless the creditors, Upon whose libels the decree 'for selling the boat was rendered, had notice of the appellee’s lien, notice to the purchaser under their decree, even before or at the the time of the sale, would not affect his purchase; because by becoming t.he pur *20 chaser, he was subrogated to the rights of the creditors, and held as they would have been entitled to hold, had they or any of them purchased the boat under their own decree, without any notice of the lien. And it does not appear that they, or any of them, ever had any notice of the appellee’s lien.
The record or a court of special and limited jurisdiction, must show, that the case was one of which the court had jurisdiction: otherwise the pro ceedings&judg’t or decree will be held void.
District courts of the U. S. have original jurisdiction in all admiralty and maritime causes — exclusive ofthe circuit courts ofthe U. S. but concurrent with the courts of com. law, where the com. law remedy is adequate and proper.
It has been often decided, and is now settled by authoritative decisions of the S. C. of U. S, that all cases concerning commerce & navigation upon the sea or any of its waters, which arise on the high sea, or in any place where the tide ebbs and flows, (e. g. on the Miss, river at N. Orleans,) are maritime causes; although they may have arisen within the body of a county, & are, therefore, such as would be held by the English qourls of common law, lo he within their exclusive jurisdiction.
*20 Second. The question as to jurisdiction is far more important and difficult. As the District Court of Louisiana is one of special and limited jurisdiction, unless the record, as exhibited in this case, shows that it had cognizance of the claims upon which it adjudicated, this Court should treat its proceedings and decree as void, for want of legal -authority in the Court. And no extension of accustomed comity would allow any other judicial course.
There is no pretence for the authority exercised by the District Court, unless the case it decided was one of maritime jurisdiction; and if the case were of that character, there can be no doubt that it was not coram non judice, for the federal constitution gives to the Federal Courts jurisdiction in all admiralty and maritime cases; and the judiciary act of 1789 delegates to the District Courts of the United States, “exclusive original cognizance (as between them and, the Circuit Courts,) of all causes of admiralty and maritime jurisdiction,” concurrently however, with courts of common law in cases in which a common law remedy may be adequate and prpoer.
A civil maritime case being one arising on the sea, or from some act or contract concerning the commerce and navigation thereof, and the Lancaster never having navigated the high sea, nor, as far as appears, being designed for any other navigation than that of the Mississippi river, and its tributaries, not nearer the mouth of the former than the city of New Orleans — we have no doubt, that, though every channel in which the sea ebbs and flows, is deemed and denominated by law, a part of the sea, and though it has been settled by the Supreme Court of the United States, that there is an ebbing and flowing of the sea tides at New Orleans — nevertheless, as, -according to the common law, as understood and practiced in England by courts of common law, when our federal *21 constitution was adopted — a civil case, arising' within the body of a county, and therefore under the guardianship of the common or local law, was cognizable in a court of common law only, the District Court of Louisiana had no maritime jurisdiction, if the .federal convention should be understood as referring to the then existing common law practiced in England', for a definition of the terms (ladmiralty and maritime,’’ as used in the constitution; for it is evident that, for many years prior to the year 1787-8, the common law courts of England had claimed and been permitted, generally, to éxercise exclusive cognizance over all such cases.
The services for which a maritime demand may be asserted, are only those performed altogether or essentially on tide water. Services on a steam boat, between Louisville and N.Orleans, are not of that character.
*21 \ But it must be admitted, that the admiralty courts of England ahvays insisted that, notwithstanding the statutes of 13th and 15 th R. II., and other positive enactments, they had a legal right to jurisdiction, either exclusive or concurrent, in this contested class of cases.— And it seems to have' been understood, also, that our colonial courts of vice admiralty exercised jurisdiction in all such cases, without question. Upon these grounds, fortified by the opinion that the maritime, and not the common law, courts of England asserted the true doctrine as to admiralty jurisdiction, antecedently to 1788, some of' the Circuit Courts and the Supreme Court of the United States have decided that a civil case arising where the sea ebbs and flows — even though it may be within a county — is a case of admiralty or maritime jurisdiction, as understood and intended by the frkm'ers and adopters of the federal constitution. De Lovio vs. Boit, 2 Gallison, 398; Plummer vs. Webb, 4 Mason, 380; Drinkwater vs. The brig Spartan, decided in Maine, and published in the American Jurist, Mo. 5, page 56; the steam boat Thomas Jefferson, 10 Wheaton, 428, 6 Cond. Rep. 173, and Peyroux et al. vs. Howard et al., 7 Peters, 324.
These decisions, and especially the two last by the ' Supreme Court of the United Stales, have, in our opinion, settled this controverted question authoritatively, so far this Court, and the case we are now considering, may be concerned.
Nevertheless, it is clear and undeniable, that Reed's libel, for services as clerk of the Lancaster, did not pre *22 sent a maritime claim; because it is well settled' that, to entitle his demand to maritime privilege, his services must have been performed, either altogether or essentially; on tide-water; and his libel and the accompanying account, not only did not show this, or any fact from which it might be presumed, but clearly implies the contrary, as they conduce to the deduction that his services as clerk were rendered between Louisville in this State and New Orleans in Louisiana. Moreover, had the service been maritime, the law would not have implied a lien in favor of the master, for his wages. Steam Boat Orleans vs. Phœbus, 11 Peters, 184.
The master of a vessel has no implied lien for his services, though they may' have been altogether maritime.
The decree of a maritime court upon a claim over which it has no jurisdiction, is void; but after the libel in such case, is filed, other parties, with-other claims, may intervene, and, if the court has jurisdiction of the latter, its decree upon all the claims, tho’ erroneous, would not be void.
An account for supplies furnished for a steam boat at N. Orleans, (where the tide ebbs and flows,) isamaritime contract- or which the U. K. district court there, has jurisdiction .
The maritime courts of the U. S. have jurisdiction in personam, as well as in rem. And where one of those courts has jurisdiction over parties, it will give effect to all the law — general and local — which is applicable to their contract, & tho' a State can confer no jurisdiction on a federal court, and tbo’ no hen may exist, in a particular case, by the general law, yet, a lien which has been given by a State law, may, as a part of the contract, he recognised & enforced hy the maritime court having jurisdiction over the parties.
*22 But if any other libel, filed by an intervening party, exhibited a maritime claim, such libel alone gave the District Court maritime jurisdiction; and therefore, however erroneous the decree, as to other claims, or upon other libels, may have been for want of jurisdiction over them; still, as'the court had cognizance to some extent, the decree is not void, and cannot, therefore, be incidentally or collaterally disregarded as Iong’as it remains unreversed.
The libel of Lazet & Amelug and that of Tucker & Craig, founded on open accounts, show, prima facie, that the claims of those libellants arose chiefly from supplies and stores furnished for the Lancaster by them, at New Orleans; and therefore, as the sendees for which they sought compensation were performed altogether where the tid’e ebbed and flowed, their claims were maritime, and cognizable by the District Court of Louisiana, according to the cases of “The General Smith,” 4 Wheaton, 438, and 4 Cond. Rep. 493, and of the “ Thomas Jefferson,” and of Peyroux et al. vs. Howard et al., ubi supra.,
As maritime cases are regulated chiefly by the doctrines of the civil law, according to which a creditor, on a maritime contract, was entitled to an implied lien on the vessel of the debtor, there might be some ground for arguing that an instance court, when proceeding civiliier^ has no jurisdiction in personam, and therefore can have no cognizance of a civil case, unless there be a resulting lien, and unless, therefore, the suit be, according to the civil law, a libel in rem. But, though this question se ems *23 to have been intentionally pretermitted and reserved for future consideration by the Supreme Court of the United States, in the case of Ramsey vs. Allegre, 12 Wheat. and 6 Cond. Rep., it should, in our opinion, he deemed to be authoritatively settled, in favor of a maritime jurisdiction in personam alone, by the incidental declaration to that effect in the previous case of the General Smith, and the express decision to the same effect, by the same court, in the subsequent case of Peyroux et al. vs. Howard et al. already cited; to the last of which, it cannot be objected, as it might be to the first, ..that the opinion of the Supreme Court, though explicit and unhesitating, was not, as to the point we are now considering, judicial and authoritative; for the only question debated in this latter case, was whether, maritime jurisdiction in personam being conceded, the District Court had also cognizance in rem; and the Supreme Court decided that, though, in that case, the law maritime gave no lien, and even though, also, the local law of Louisiana could not give jurisdiction to the federal court, yet having, independently of the local law, jurisdiction of the case in personam, that Court had authority to enforce a lien given by that law, and therefore had a consequential jurisdiction in rem. It is evident that, according to the argument of the Supreme Court, the lien given by the statute of Louisiana did not confer maritime jurisdiction on the District Court of the United States, and -that therefore, independently of the lien, that court had such jurisdiction, and, of course, in personam only; and that the Court thus having maritime jurisdiction over the parties, had a right to proceed and to decide the case, according to all the law, whether international or merely local, which .operated'upon their contract themlitigated. Upon that point, the Court was, not only unequivocal, hut unanimous; and therefore, their decision is authoritative, so far as the inferior federal courts are concerned, and so far, consequently, as it may affect this case as now presented in this Court.
■ We are inclined to'infer that the Congress of 1789 entertained the same opinion as to the existence of a maritime .jurisdiction in personam, even though the lex *24 maris gave no lien, and therefore authorized no proceeding in rem; for, in the judiciary act of 1789, the proviso in favor of a concurrence of maritime and common law jurisdiction in an undefined class of cases, was altogether proper and consistent upon the hypothesis that there may be maritime contracts without maritime lions, and as to which contracts, though maritime courts might be entitled to jurisdiction, courts of common law should also have concurrent cognizance, because such cases may he decided exclusively upon rules and principles of the common law — there being no question of civil or maritime law which a court of common law would have no authority to decide.
'There may be a maritime jurisdiction in personam, where there is no lien, and consequently, no jurisdiction in rem-, a ‘decree in rem, for a sale, iu such case, would he, at least, erroneous.
The wages of seamen, earned •wholly, or substantially, upon the high seas, or upon tide water, are secured by a lien on the vessel. But—
*24 And we are, moreover, inclined, with Mr. Chancellor Kent and with Mr. Justice Story, to the opinion that, in such cases especially, courts maritime and courts of common law would, independently of the proviso in the act of 1789, be entitled to a concurrence of jurisdiction according to the united recognitions by each of those classes of courts, which may be inferred from the practice and decisions in both, as well before as since the adoption of our federal constitution.
But, though, according to the foregoing views and authorities, water which ebbs and flows from the high sea should here be deemed a part of the altum mare, and though a contract made at such a place, for supplying a ship or steam boat, may be maritime in its nature, and therefore the subject of maritime jurisdiction in personam, nevertheless the law of the contract may give no implied lien on the vessel, and therefore the court may have no jurisdiction in rem; and in such a case, of jurisdiction in personam only, a decree in rem would he' erroneous at least. And it is argued, in this case, .that even though some of the libels may, prima facie, have exhibited cases of maritime jurisdiction in personam, still the law did not in any of them imply a lien on the boat, and that, therefore, the decree against it, and the consequent sale of it, passed no title to it, and consequently, could not have affected the appellee’s lien upon it.
Though it is admitted that, for obvious and peculiar reasons, seamen or mariners, who make no special con *25 tracf to the contrary, are entitled to an implied lien on the vessel for services rendered on the sea, or substantially thereon, or on the flux and reflux thereof, and though also, Lord Mansfield said, in Rich vs. Coe, Cowp. 636, and in Farmer vs. Davis, 1 Term Rep. 109, that “a person who supplies á ship with necessaries has, not only the personal security of the master and owners, but also the security of the specific ship;” yet it was the established doctrine in England, as early as 1787 and before, (1) that there is no such implied lien in favor of the master for his services, because,-nothing appearing in the contract to the contrary, the law presumes that he trusted the personal credit of his employer; and (2) that material men, or those who had made repairs, or ■furnished supplies or materials, have no implied lien on -the ship repaired or supplied, unless the repairs were done, or the supplies furnished, at the instance of the master in a foreign port, or on the high sea, in the absence of the owner; because, as is said, the law should give a lien on the vessel when there is no other security for necessaries which it needs, and, therefore, if repairs be made or supplies be furnished within the jurisdiction of the local government of the owner, the law should presume that those necessaries were furnished upon his personal credit alone, except in the case of a shipwright who holds the ship until his services are compensated, and who, in such a case, has, "by the common law, a right, like the tailor or blacksmith, to retain the possession of the thing, upon which his skill and labor have been expended, until the owner will pay him a just compensation; but such a common law lien is gone as soon as the thing be delivered to the owner, or he shall have been permitted to take it away.
The master has no lien for his services; he trusts to the personal responsibility of his employer.
A shipwright has a lien upon, and may retain possession of, the vessel which he huilds or repairs —uponthe same principle that other mechanics— as a smith or tailor, may retain the materials to which they apply their skill and labor, until they are paid; but whenever the possession is relinquished, the lien ceases.
“Material men,” or those who make repairs, or furnish supplies for vessels (or steam boats,) have — under certain circumstances, liens on the vessels or boats. In England, it seems,those who repair ships, or furnish supplies or materials for them, anywhere in the kingdom, where — theowner being there— the courts of commonlawmay enforce the cou•tract — have no liens; .they are supposed to trust to the personal responsibility of their employers. But, upon foreign vessels there repaired or supplied, or English vessels repaired or supplied in foreign ports, or -on the high sea, in the absence of the owner, a lien attaches.
*25 In Wilkins vs. Carmichael, 3 Doug. 101, decided only two years after that of Rich vs. Coe, supra, Lord Mansfield himself said — “Work done for a ship in England is “ supposed to be on the personal credit of the employer. . “ In foreign parts the master may hypothecate the ship;” and he might have added that, therefore in foreign parts, the law would imply a lien on the ship. And the same principle was virtually recognized in the cases of Hoare *26 vs. Clement, 2 Show. 338, and Justin vs. Ballam, Salk. 34, and Watkinson vs. Barnardiston, 2 Pr. Wms. 367; and Buxton vs. Snee, 1 Ves. 154. In this last case Lord Hardwick said — “ Certainly, by the maritime law, the master “ has power to hypothecate both ship and cargo for repairs, &c. during the voyage; which arises from his “ authority as master, and the necessity thereof during “the voyage, without which both ship and cargo would “perish; therefore, both that and the law of this country “admit such a power. But it is different where the ship “ is in port infra corpus commitatus, and the contract for “repairs, &c. made on land in England; then the rule “ of that law must prevail.” And in Watkinson vs. Barnardiston, supra, Sir Joseph Jeleyl, master of the Rolls— “ If the ship be in the river Thames, and monéy be laid “ out there, either in repairing, fitting out, new rigging “or apparel of the ship, this is no charge upon the ship; “but the person thus employed, or who finds these ne- “ cessaries, must resort to the owner thereof for pay- “ ment; and in such a case, in a suit in the court of ad- “ miralty to condemn the ship for non-payment of the money, “the courts of law will grant a prohibition, * * * * * “But it is true that, if at sea, where no treaty or con- “ tract can be made with the owner, the master employs “ any person to do work on the ship — this, for neces- “ sity and encouragement of trade, is a lien upon the ship, “ and in such case the master, by the maritime law, is al- “ lowed to hypothecate the ship.” But, in The John, 3 Roh. A. R. 288, Lord Stowell allowed merchants of Lorn-don, who had furnished the master of an American ship with stores on the Thames, to come in for contribution out of the proceeds of the sale of the ship, under an order of the court of admiralty in England.
In the U. S. the settled doctrine is, that where repairs are made, or materials or ■supplies are furnished,foramaritime vessel, at any port or place where the owner is not present •to make the contract, the “material men” (where there is no special contract,) have liens on the vessel for their security. Rut when the owner is present with the vessel, the law presumes that the contract was made with him, upon his ordinary responsibility, and no lien attaches to the vessel.
It seems to us, that the principle of the doctrine thus settled in England, is, not that intimated by Lord Plardwiclee, to wit: that the contract being made in England the common law alone applied to it; but is that stated by Sir J. Jeleyl and indicated by Lord StoWell, to wit: that, the owner not being at the place where the contract was necessarily made, the master had a right to hypothecate the vessel for necessaries, and that, there *27 fore, there being no special contract, the law would imply a lien,
But whatever may have been the prevailing reason in England, the Supreme Court of the United States has, more than once, decided that, for repairs done or supplies furnished to a maritime vessel, in a foreign port, the law will, if there be no special contract, imply a lien on the vessel. The General Smith, supra, and the St. Jago de Cuba, 9 Wheaton, 409, and 5 Con. Rep. 631. And"in this last case, the court explained “ the home port” to mean, not necessarily the vessels chartered home, or the place of the owner’s domicil, but any port or place where the owner should happen to be with Ms vessel. For the court said, “ it is not in the power of any one but the ship- “ master, not the owner himself, to give these implied “liens on the vessel; — the vessel must go on; this is the “consideration that controls every other; — for these pur- “ poses the law maritime attaches the power of pledging “ or subjecting the vessel to material men, to the office “ of shipmaster; and considers the owner as vesting him “ with those powers, by the mere act of constituting him “shipmaster. The necessities -of commerce require “ that when remote from the owner, he should be able “to subject the owner’s property to that liability, with- “ out which, it is reasonable to suppose,- he will not be “able to pursue his owner’s interest. But when the “ owner is present, the reason ceases, and the contract “ is with the owner himself, on his ordinary responsibil- “ ity, without a view to the vessel as a fund from which “ compensation is to be derived. From this view of the “ subject, this Court will be best' understood when it “speaks of the home port of the vessel, an epithet which “it is very easy to perceive has no necessary reference “ to State or other limits.”
In England, however, it appears, from the cases already herein cited, thát-r-the own'er living in England —his vessel should not be deemed to be in a foreign port; but, as to the question of implied lien, should be considered as being in its home port, whenever it was at any place within the jurisdiction of the common law courts of that island. And if this view can be recon *28 ciled with that given in the case of The St. Jago de Cuba, by our Supreme National Court, then, so far as these co-states may be concerned, a vessel should be deemed to be in its home port whenever it is at any place within the State in which the owner resides. But if there be any essential discrepancy in this particular, between the opinion of our Supreme Court and that of the courts of England, yielding, as we would be inclined to do, to the authority of our own tribunal, we should hold any place where the vessel and its owner are not together, to be a foreign part or port. It is not necessary to settle this point more definitively now; because it not only does, not appear, in this case, where the owner of the Lancaster resided, or what place was the registry home of the vessel, but it does appear, or is strongly to be inferred, that, when- the supplies were furnished by Lazvt & Amelung and by Tucker Craig, the owner of the boat was in New Orleans, commanding the boat; and therefore, as those merchants made no special contract with him for a lien or other collateral security, the law presumes they trusted to his personal responsibility, and did not look to his boat as a security, unless the local law of Louisiana gave them a lien oh it.
knows that the According to the Justinian code, alien existed upon a ship in favor of a creditor, for repairs materials or supplies. The civil law of France, as it existed at the time of the cession of Louisiana, gave a similar lien which continued one year notwithstanding an intermediate sale of the vessel to a stranger. And as this Court civil law of France was the basis of the laws of Louisiana, and does not know that the lawof lien, as it existed at the time of the cession, has been changed, it cannot decide that the district court of the United States in Louisiana, had no jurisdiction in- rem of the claims of “material men,” even where the owner was present at the time of the contract; or that a decree of that court, subjecting a steam boat to sale, to satisfy such claims, wae not valid.
Though there has been no attempt in this case to prove that there was any local law giving any such lien, yet we know that, according to' the Justinian Code, it would have existed in favor of the creditors just mentioned, and we know, too, that the civil law of France, as it existed antecedently to the cession of Louisiana to our national government, would have entitled them to a lien for one year, even though there may have been an intertnediate sale of the boat by the owner to a stranger'; and knowing, as we also do, that the civil law of France was the basis of the local law of Louisiana, we cannot know judicially, whatever we may believe personally, that, in respect to this question of implied lien and pri *29 ority, the law of France was ever so modified in Louisiana, as not to entitle Lazet & Amelung and Tucker & Craig to implied liens on the Lancaster, for the supplies furnished for her by them, even to the owner at New Orleans. ■ And, therefore, we do not feel authorized to .decide, that the District Court had not, what it claimed and exercised, jurisdictions rem, ás well as in personam. Having jurisdiction over the parties, upon maritime contracts, for supplies at New Orleans, we should presume that the whole decree was right, and that the court had power to render it. But if the decree in rem be erroneous, that circumstance alone could- not affect this case.
The parties to a libel suit, having agreed on the record,that the boot libelled bhould be sold by the court,''the agreement gave the court authority to make the sals ■ — which is therefore valid, whether the court had jurisdiction in rem, or only in personam.
No enquiry as to errors prejudicial to a party who did not join in the appeal — tho’ the decree is reversed in tolo™
But moreover, were it conceded that there was no lien in consequence of any local law, still, as the District Court had maritime jurisdiction in personam at least, and the parties over whom it had cognizance, and who were before it, agreed on its record, that it might forthwith sell the boat, it thereby acquired authority to do so, and the sale pursuant to that agreement, was therefore binding on all the parties to the agreement, of whom the owner was, of course, one — and who has also since ratified the sale.
Wherefore, as the only responsibility of the appellants, Reid and Case, is that which was supposed to have resulted from the assumed liability of the Lancaster since the sale of it to Henshaw, the decree as to them must be reversed, as no objection has been made to the prosecution of an appeal by them alone, and as the decree in personam is against them and Hinkle jointly, the entire decree must be reversed, even though Hinkle has not- complained.
But, as he has not sought a reversal, we shall not en-quire whether there is any error to his prejudice.
Decree reversed, and cause remanded, with instructions to dismiss the bill as to the appellants, Reid and Case.