## THE PENNSYLVANIA.

### (Circuit Court of Appeals, Second Circuit. April 30, 1907.)

### Nos. 174, 175.

**1. ADMIRALTY—JURISDICTION—MARITIME CONTRACTS.**

Contracts of a mixed nature are not cognizable in the admiralty courts, and, where the principal subject-matter of a controversy belongs to the jurisdiction of a court of common law or of equity, the incidental matters must also be relegated to the appropriate jurisdiction, although of themselves they might be cognizable in admiralty.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Admiralty, §§ 131–149, 185–190.

Jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347, and Board of Com'rs v. Howard, 27 C. C. A. 530.]

**2. SAME.**

A corporation organized to conduct a boys' school on shipboard, chartered a vessel for the purpose, and also entered into contracts with libelants, by which it engaged to take pupils for the school year, who were to be received on board and taught the ordinary studies of a preparatory course. During the year, the ship was to make a voyage to foreign countries, and the pupils were to be organized into a cadet corps and given instruction in nautical and naval matters. *Held,* that such contracts were not maritime, and that their breach by the corporation did not give libelants a lien on the vessel enforceable in admiralty.

Appeal from the District Court of the United States for the Southern District of New York.

The following is the opinion of the District Court:

HOLT, District Judge. These suits are brought to recover damages for a breach of an alleged contract for the transportation of passengers. In June, 1904, the owners of the steamship Pennsylvania chartered her to the Nautical Preparatory School for one year from June 1, 1904, for $3,000 a month. The Nautical Preparatory School was a corporation organized to conduct a boys' school on shipboard. The general scheme was to have a school on a ship, in which the ordinary subjects studied by boys in fitting for college should be taught. The ship, during the school year, was to make a voyage to the leading ports in the Mediterranean and the West Indies, ultimately returning to this country. It was not the principal object of this school to teach the boys seamanship or navigation, but they were to be organized as a cadet corps, and given incidentally some little instruction in navigation. The fundamental idea, however, was not the teaching of seamanship, but the establishment of an ordinary boys' school on a ship, giving boys the experience of a life at sea, and of a voyage to the leading sea ports of the Mediterranean and the West Indies, under intelligent supervision. The price to be paid for each boy was $1,280 a year, payable in advance. The boys were to meet about the middle of September, 1904, at Providence, R. I., the port from which the ship was to sail. About 170 such boys were enrolled in the school, assembled at Providence about the 15th of September, went on board the steamship, and remained there about two weeks. About the 29th or 30th of September, the charterer having got into such pecuniary embarrassment that it could not carry out its contract, the voyage was abandoned, and the boys left the ship. The libelants are parents or grandparents of certain boys, each of whom paid the tuition charge of $1,280. They have filed this libel in rem against the steamer to recover for the damages caused by the charterer's failure to comply with its contract.

It is alleged in defense to this action that the contract in question was not maritime in its nature. It is claimed that it was a contract to keep a school, and that the voyage upon the steamer to Europe and back was a mere incident of the contract. The question involved is novel. The rule, of course, is well

settled that an ordinary contract for the transportation either of goods or of passengers, although made by a charterer, imposes a maritime lien on the ship which can be enforced against it by a proceeding in rem (The Moses Taylor, 4 Wall. 411, 18 L. Ed. 397; The Aberfoyle, 1 Blatch. 360, Fed. Cas. No. 17); but it is apparent that, in such a case as this, the application of the general principle imposes a very heavy liability upon the owners of the vessel, which at the first glance seems inequitable. If the master of an ordinary school on land had hired certain premises in which to carry on the school, and had then violated his contract with his pupils' parents for their instruction, not only would it be deemed an absurd claim in law that any lien would arise against the owners of the real estate for tuition paid, but any attempt to make them liable would, I think, be regarded as inherently unjust. But the rule in admiralty that the ship is liable for all contracts of affreightment or transportation is based on the fact that a ship is constantly moved from one part of the world to another, and.that creditors would have no adequate security and no prompt remedy for the collection of debts incurred in the operation of the ship, if, as in the case of land contracts, they were obliged to proceed against the person who incurred the debts by suits in personam. The principle, therefore, is fundamental in the admiralty that the ship is bound for all contracts, either of affreightment or transportation, and, if this was in fact a maritime contract for the transportation of these boys from this country to Europe and return, it is difficult to see why the ordinary rule is not applicable in this case. It is obvious that the object of the contract was at least partly maritime. The boys were to be taken to Europe and back, and they were to be incidentally given some instruction in subjects which could only be properly taught on shipboard. The charter party was, of course, a maritime contract, and, for my part, I cannot see why, so far as the contract for tuition involved the chartering and use of a ship, it was not, to that extent, a maritime contract. The fact that a school was to be carried on during the voyage does not seem to me to be the predominant feature of the scheme, at least so far as the liability of the ship is concerned. Undoubtedly, a portion of the $1,280 paid by the parents of each pupil was for tuition; but a considerable portion also must have been paid to reimburse for the expense involved in the charter of the ship. The question is a nice one, but in my opinion the contract between the parents and the school was a contract, among other things, for the transportation of passengers to Europe and back, for the performance of which, on general principles, the steamer was liable in rem.

But it is also a general principle that no lien arises so long as such contracts of affreightment or transportation are purely executory. If the voyage is abandoned without anything having been done under the contract, no action lies in rem. The question, therefore, in this case, is whether the fact that the boys went aboard the ship and lived on it at Providence for some two weeks constituted a beginning of the voyage, within the authorities, which imposed a maritime lien on the steamer. There are some cases which seem to intimate that, if any portion of the cargo is put on board or delivered on the dock into the custody of the ship for transportation, a lien attaches, although the voyage is afterwards abandoned; but I have found no authority for the proposition that, under a contract for the transportation of a passenger, the mere fact that the passenger has gone on board the ship is sufficient to impose a maritime lien on the vessel, if the voyage is never undertaken, and is abandoned. In The City of London, 1 Wm. Rob. Adm. 88, Dr. Lushington said: "Now, in the course of the arguments that have been addressed to the court, it has been admitted on the one side that if a seaman is engaged on board a vessel, and the owners think fit to abandon the voyage for which such seaman has been engaged, he would not be entitled to sue in this court for his redress, but must seek his remedy at common law, by an action on the case. To this position I am disposed to accede, and for this reason: That in such a case there would be nothing to show the real amount of loss sustained. * * * But, again, there is another case in which it has been admitted that the court has jurisdiction, viz., where a seaman has been taken on board, the voyage been prosecuted, and during its progress the seaman has been un-

duly discharged. In this case, it is acknowledged that the seaman so discharged may seek his remedy in this court."

In The Bella (D. C.) 91 Fed. 540, 542, it is said: "Until a passenger has rendered himself on board, for the purpose of being carried as a passenger, performance of the contract has not been commenced, so as to subject the vessel to a lien. The Eugene (D. C.) 83 Fed. 222; Id., 31 C. C. A. 345, 87 Fed. 1001. Merely going on board to inspect the vessel, or to select and reserve a sleeping berth, is not any part of a journey, nor the beginning of the relation of carrier and passenger. So the owner of the cargo has no lien upon the vessel for the breach of a contract of affreightment, until the cargo, or some portion, has been laden on board or delivered to the master. Scott v. The Ira Chaffee (D. C.) 2 Fed. 401, and cases there cited. See, also, Schooner Freeman v. Buckingham, 59 U. S. 182, 15 L. Ed. 341; The Eugene, 87 Fed. 1001, 31 C. C. A. 345; The Priscilla, 114 Fed. 836, 52 C. C. A. 470, and cases there cited."

The only evidence in this case upon which claim can be made that the contract did not remain purely executory is the following statement contained in the stipulation upon which this case was submitted: "(7) Each of the boys enrolled as students, as aforesaid, went on board the said steamship Pennsylvania pursuant to the said enrollment and payment of consideration, as aforesaid, at or prior to September 15, 1904, the said steamship then lying at Providence, R. I., and each of the said boys so enrolled remained on board the said steamship about the period of two weeks, and each left the said steamship on or about the 29th or 30th of September, 1904, at Providence, aforesaid, when and where the said voyage and cruise of the said steamship was abandoned."

The inference from this statement is that the boys lived on the steamship for about two weeks, while she lay in port at Providence waiting to sail. If during that period they had remained at a hotel or boarding house at Providence, and had not gone on board until the ship was ready to sail, it seems to me clear that no claim could be made that any lien attached to the ship. The question is whether the single fact that they lived on board during the two weeks, until the abandonment of the voyage, is sufficient to impose a maritime lien on the vessel. While the question is not free from doubt, I think that no lien was created. The boys during those two weeks simply boarded on an anchored vessel. They were not yet, in my opinion, in a legal sense passengers on a ship.

My conclusion is that the libel should be dismissed, with costs.

J. M. Perry and William S. Maddox, for appellants.

Henry G. Ward, William S. Montgomery, and Robinson, Biddle & Ward, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

WALLACE, Circuit Judge. The libelants, who brought this action to enforce a lien against the steamship, were defeated in the court below, and this appeal presents the question whether by their contract with the charterer of the steamship Pennsylvania, and the charterer's breach of the contract, they acquired a lien against the vessel enforceable in admiralty. It is conceded for the appellant that, if the contract was maritime in its nature, the libelants acquired a maritime lien by the charterer's breach, and the real inquiry therefore is whether the contract was in such sense maritime as to be cognizable in admiralty.

By a charter party made in June, 1904, between the owner of the Pennsylvania and the Nautical Preparatory School, the "bare ship, without crew, fuel or supplies," was let to the latter for the term of one year, and soon thereafter possession of the vessel was delivered

by the owner to the charterer. The Nautical Preparatory School was a corporation of Rhode Island, organized for the "purpose of conducting a school for boys on shipboard." Prior to September, 1904, the school corporation had made contracts severally with the libelants, whereby they respectively enrolled their sons as "cadet pupils" in a school to be conducted on board the steamship for the school year beginning September 15, 1904. These contracts were induced by a prospectus circulated by the school corporation, setting forth its educational scheme and the terms and conditions of its undertaking. The prospectus represented that the vessel had been chartered, and would be equipped with a library, museum, laboratory, and gymnasium; that a corps of skilled instructors would direct the studies of the pupils in a curriculum including mathematics, history, geography, literature, and the languages, and a competent director would have charge of their physical training; that the school would maintain a naval organization and discipline, the cadets being formed into companies with officers selected from themselves, and the cadets would be instructed in naval and military drills, and in the handling and navigation of the vessel; and that the school year would comprise a nine months' cruise upon the steamship to foreign countries and visits by the pupils to all places of interest in charge of the professors. The charges per school year were to be $1,280, payable in advance, covering "tuition, board, laundry, clothing, uniforms, text-books, all expenses on shore, languages, the installation of class museums, gymnastics, and athletics, and all the many extras which swell the simple tuition charges of other schools." The libelants made the advance payments of $1,280 each. Prior to September 15, 1904, the pupils went on board the steamship at Providence, where she was lying in port, and remained on board about two weeks, when the school corporation, apparently because of pecuniary embarrassment, abandoned the voyage, and the pupils left the vessel.

It is not enough that the contract includes a maritime adventure among its objects, or that it was to be performed at sea. Unless it was purely maritime, it was not one of which a court of admiralty has jurisdiction. In the language of Justice Clifford, in The Belfast, 7 Wall. 637 (19 L. Ed. 266):

"Contracts, claims, or services, purely maritime, and touching rights and duties appertaining to commerce and navigation, are cognizable in the admiralty courts."

Contracts of a mixed nature are not cognizable in these courts, and that there is a sufficient reason for this is well illustrated by the present case. Here is the ordinary contract between school proprietors and patrons, with the further provisions that the school is to be located on shipboard, and the course of instruction is to include a foreign voyage and studies in nautical and naval matters. Combined with the provisions of common-law obligation are some that may relate to maritime services. How can a court of admiralty separate the liabilities and apportion the damages arising from the breach of the maritime part of the contract? Whenever the principal subject-matter of a controversy belongs to the jurisdiction of a court of common law, or of equity, the incidental matters must also be relegated to the appropriate

jurisdiction, notwithstanding of themselves they might be cognizable in admiralty. Kellum v. Emerson, 2 Curt. 79, Fed. Cas. No. 7,669; Grant v. Poillon, 20 How. 162, 15 L. Ed. 871; Minturn v. Maynard, 17 How. 477, 15 L. Ed. 235; Hall v. Hudson, 2 Sprague, 65, Fed. Cas. No. 5,935; Vandewater v. Mills, 19 How. 82, 15 L. Ed. 554.

In Plummer v. Webb, 4 Mason, 380, Fed. Cas. No. 11,233, Judge Story had occasion to consider a somewhat similar question in a case where a minor had been apprenticed by his parent for a voyage to sea, and had received improper treatment by the master of the vessel. Judge Story said:

"I cannot say that the whole contract is here of a maritime nature. There are mixed up in it obligations ex contractu not necessarily maritime, and so far the contract is of a special nature. In cases of a mixed nature, it is not a sufficient foundation for admiralty jurisdiction that there are involved some ingredients of a maritime nature. The substance of the whole contract must be maritime."

In Krohn v. The Julia (C. C.) 37 Fed. 369, it was held that a contract by the master of a vessel to carry cargo, sell it, and account for the proceeds, could not be enforced in admiralty. In The Illinois, 2 Flip, 383, Fed. Cas. No. 7,005, it was held that the breach of a contract for maintaining a bar for the sale of liquors upon a vessel was not the subject of admiralty cognizance. In both of these cases the contract was regarded as a common-law contract, notwithstanding it related incidentally, and to that extent materially, to the navigation of a vessel. So, in the present case, what was to be done on shipboard was merely an incident of a contract which was essentially of a common-law nature.

We entertain no doubt that the libel should have been dismissed, and the decree is therefore affirmed, with costs.