## P. DOUGHERTY CO. v. BADER COAL CO.

(District Court, D. Massachusetts. January 27, 1917.)

No. 1416.

1. SHIPPING ☞54—CHARTERS—LIABILITY FOR INJURY TO VESSEL—GUARANTY OF DEPTH AT DOCK.

A guaranty in the charter party of a barge of a certain depth of water at the dock where she was required to discharge extends also to the surrounding water which would naturally be traversed or used by a vessel of her dimensions in discharging there or the use of which in the course of discharging should reasonably have been anticipated.

2. SHIPPING ☞54—CHARTER—LIABILITY FOR INJURY TO VESSEL.

A charter party of a barge to carry a cargo of coal to be discharged at a certain dock by the charterer guaranteed 12 feet of water at the dock. The barge was too long to be discharged at the wharf in the ordinary manner, and it was necessary to turn her to reach the hatches at one end, and in doing so she stranded and was injured, although her draft was less than 12 feet. *Held*, that the charterer was bound to anticipate the probable necessity of such turning, and that the guaranty of depth applied to the water necessarily used in making the maneuver, and that, being charged through its consignee as its agent with the duty of handling the vessel in discharging, it was liable for the injury, although the master took charge of the movement.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by the P. Dougherty Company against the Bader Coal Company. Decree for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for plaintiff.

Berry & Bucknam, of Boston, Mass., for defendant.

MORTON, District Judge. This is a libel by the owner of a barge against the charterer to recover damages for injuries received by the barge through grounding at or near the dock of the Augusta State Hospital, at Augusta, Me. The facts are as follows:

The Dougherty Company owner of the barge Maine, chartered her to the Bader Coal Company, to take a cargo of coal from Norfolk, Va., "to alongside dock of the Augusta State Hospital, 12 feet of water guaranteed, Augusta, Me." The owner was to do the towing to Parkers Flats, near the mouth of the river, above which point it was to be done by the charterer. The barge was duly loaded at Norfolk, and the voyage was completed to Augusta. The discharging was to be done by the charterer or its consignees or representatives.

When the barge was being placed in the dock at high water, about 1 p. m. on Monday, her stern grounded 5 or 6 feet out, and she could not be got in any further. She was then drawing about 4 inches over 12 feet. The discharging apparatus was shifted slightly to reach her, and discharge was commenced from the rear hatch. Enough coal was taken out that afternoon so that her draft was reduced to 12 feet or less. On the high tide that night she floated and was hauled in snug to the wharf. It does not appear that she suffered any damage from this grounding. On the following low tide the rudder grounded on a rock and was forced up, doing some damage.

The next forenoon (Tuesday) the discharge was continued, and the rear hatch was cleared. It then became necessary to discharge from the forward hatch; and in order to get at it with the stationary discharging apparatus with which the dock was equipped, it became necessary to change the position of the barge. It was the duty of the charterer (or of the consignee which stood in its place) to make this change. Hastorf v. Moore (D. C.) 92 Fed. 398; Thompson v. Winslow (D. C.) 128 Fed. 73; Id., 134 Fed. 546, 67 C. C. A. 470 (C. C. A. 1st Cir.). The representative of the consignee proposed to do so by hauling the barge back along the wharf. This would have been the proper method if there had been good water for a sufficient distance astern of the barge as she then lay. ·The dock was, however, too short for the barge to be· so moved at it. She was much the largest vessel that had ever been there and was too long to be properly accommodated. Obviously this was something for which the owner of the barge was not in any way responsible. Her master objected to hauling her back, saying that such a movement would bring her stern over rocks on which she would rest at low tide and by which she would be injured. He declined to allow it to be done; and in this he was clearly right.

The only other way to get at the coal in the forward hatch with the discharging apparatus was to turn the barge around; and the best way to do that was to get tugs and have· them turn her. There were no tugs at hand, and this method would have involved expense and delay for the consignee. In order to avoid it, the consignee's representative proposed to swing out the bow of the barge, which was pointing up river, until it caught the current, and then let it swing around downstream, holding the stern against the wharf. The rail of the barge was above the top of the wharf, and her master again objected, saying that the rudder of the barge would be forced hard against the wharf and would be broken. In this also he was right.

The details as to what next occurred are much in dispute, and the testimony cannot be reconciled; but I think, and I find, that it was substantially as follows: A discussion took place between the consignee's representative and the master of the barge as to how she should be turned. The master. expressed his opinion that, if she was to be turned without tugs, the way to do it was to pull her stern out and around upstream. The consignee's representative finally said, in substance: "Go ahead and do it in your own way. We will let you have our men." The master testifies that the consignee's representative said he would take the responsibility for any injury to the vessel. The consignee's representative denies this. He testifies, and is corroborated by some of his workmen, that he said the master was to take the responsibility, and the master agreed to do so, which the master denies. The change of position was nothing which the barge was interested in having done. It devolved upon the charterer, or the consignee, to get the cargo out of her in a proper way within the lay days, or to pay demurrage. She was adequately protected by the provision for demurrage in the charter party. There was no valid reason for her master to assume responsibility for injury and little likelihood that he would do so, even if, which I doubt, he had

authority to bind the vessel by such an agreement in the absence of any necessity therefor. The master was informed about rocks astern of the barge as she lay in the dock, and there was undoubtedly talk about them. It is possible that some of the witnesses who testified to having overheard warnings given him as to obstructions out in the river were mistaken as to what was referred to in the conversations, parts only of which they claim to have overheard. The evidence fails to satisfy me either that the master was warned or knew about obstructions out in the river before the accident or that he, or the consignee's representative, explicitly assumed responsibility for injuries which might be received by the barge in the effort to turn her without tugs.

Following the talks referred to, an attempt was made to turn the barge around by swinging her stern upstream. The master was in command of this undertaking, the consignee's men assisting in it under his orders. When the barge was well out into the river, control of her was lost, she swung back, grounded, and lay out in the river over two low tides. The effort to swing her around was abandoned. and tugs were sent for. They arrived the next day (Wednesday), completed the turning, and replaced the barge alongside the wharf. Thereafter the discharge was accomplished, apparently, by hauling the barge backward and forward along the wharf. After the completion of the discharge, the barge was found to be seriously injured by grounding.

The minimum depth of the water in and near the dock while the Maine was there cannot be exactly determined. An elaborately prepared chart has been put in evidence by the respondent, giving the depth in 10-foot squares. But it is to be noted, in the first place, that the depths given on this chart refer to mean low water, while there is uncontradicted evidence that at this time there was an unusually low run of tides, and, in the second place, that the figures refer to a height of the river (aside from the tide) about 2 feet greater than probably then existed. The depths shown on the chart appear, therefore, to be at least two feet too much; how much more than two feet is uncertain. Making these corrections, it is apparent from the chart that there was not the guaranteed depth of water at the dock, and that the barge must have grounded there, as her master says she did, during every low tide, until the discharge was pretty well advanced. It is the contention of the libelants that the major injuries were received in this way. It is the contention of the respondent that they were occasioned by the turning in the river. The libelant contends that the respondent's chart shows that there was nothing in the river on which the barge could have stranded, and that she did not strand there. But the chart was made by vertical soundings only; and it was entirely possible that rocks not of much area might not be detected or shown on it. Something certainly happened which caused the parties to abandon the attempt to swing the barge around. No reason has been suggested except that she grounded. There is testimony by disinterested and apparently accurate observers that she clearly appeared to be aground in the river. I find that she did ground and lie there substantially as claimed by the respondent.

It is obvious that, if a loaded barge grounded at high water on a detached rock projecting above the river bed, and remained there

over two low tides, having a fall of more than 4 feet, she might be severely injured. The character of the injuries might be helpful in determining whether they were received in this way; but no evidence has been offered concerning them, although it was obviously within the power of the libelant to do so. Upon all the evidence I find that the Maine received her principal injuries through the stranding in the river, that she was also injured by grounding in the dock, and that at the time of said stranding and grounding she was drawing less than 12 feet of water.

[1] The charter party constituted an express invitation and license to the Maine to use the dock. This invitation extended to the approaches to the dock, and to the water which would naturally be traversed or used by a vessel discharging there. Hartford & N. Y. Transp. Co. v. Hughes (D. C.) 125 Fed. 981, reviewing authorities; Smith v. Burnett, 173 U. S. 430, 436, 19 Sup. Ct. 442, 43 L. Ed. 756. The guaranty was, as to the points under discussion, as broad as the invitation. It insured to the Maine at least 12 feet of water, under all ordinary conditions, in the dock referred to and in its individual approaches (as distinguished from the common channel) and in the immediate vicinity of the dock where a vessel using it might fairly be expected to pass, except, perhaps, in places as to which express notice to the contrary was given by marks or otherwise. The Annie R. Lewis (D. C.) 50 Fed. 556.

Under this construction of the guaranty, it is clear that for the injuries which the Maine received while lying at the dock the respondent is liable. Whether it is also liable for the injuries received out in the river depends on whether it should reasonably have been anticipated by the respondent when the charter party was made that, in the course of the discharge, the barge might be moved over the place where she grounded. If so, the guaranty would apply thereto, no express warning to the contrary having been given, and the questions of negligence become immaterial.

[2] If a change of the barge's position by swinging her at the wharf was reasonably to have been anticipated in the course of the discharge, the water where she was grounded was so likely to be used in such a movement that it was fairly within the scope of the guaranty. It is true that the barge did not pass over that place on the swing upriver; it was not until control of her was lost and she fell back that she hit the obstruction. Just how far she fell back before striking is not clear on the evidence; but I infer that it was a comparatively short distance. Her bow seems never to have got out of control, and to have been against, or very close to, the wharf or river bank, all the time. Apparently the stern was hauled pretty straight out into the river, and the bow was allowed to follow down the bank and the front of the wharf. When control was lost, the barge pivoted on the bow, and the stern swung down onto the rocks. If the barge had been swung bow out, as the consignee proposed to do, she would have gone over, or very close to, the place where she was injured.

Whether a swinging of the barge at the wharf ought reasonably to have been anticipated by the charterer is perhaps doubtful. With

one exception, all the vessels that had previously discharged there had been much shorter than the Maine, and apparently had been hauled backward and forward along the wharf. One other vessel, too long to be handled in that way, had been there shortly before the Maine. It had been turned for discharge, but by the use of tugs. The charterers were bound to know that the vessel which they chartered was too long to discharge at the dock in the ordinary way and would have to be turned during the discharge. If turned, she would have either to be swung or to be moved by tugs. The swinging method was adopted at the suggestion of the charterer's representative, the consignee, and was apparently regarded by both parties before the accident as an ordinary method of changing a vessel's position at a wharf where she could not be moved backward and forward. As the swinging movement was requested and suggested on behalf of the consignee, there may be doubt whether it is now open to the charterer to contend that it was improper and unusual. It has been held that a consignee's request to place a vessel in his dock, or under some circumstances his silence even, when he knew the vessel was about to go there, carried an implied representation that the place and the approach were safe for her. Hale, J., Phila. & Reading Ry. Co. v. Walker (D. C.) 159 Fed. 857; Look v. Portsmouth, etc., Ry. Co. (D. C.) 141 Fed. 182. Assuming, however, that the point is open to the respondent, it seems to me that at a dock where the vessel under charter would have to be turned during discharge, and at which tugs were not readily available, the charterer was bound to anticipate that an effort was likely to be made to reverse the direction of the vessel by swinging. I therefore hold that the guaranty covered the water in the river where the Maine grounded, and that the respondent is liable under it for the injuries there received.

If the swinging of the barge without the assistance of tugs was something unusual and extraordinary, it ought not to have been attempted, and it was negligence to undertake it. In this connection and in view of the possibility of appeal, a finding ought perhaps to be made on the further question whether the barge was making the turning movement on her own account, as a gratuitous assistance to the charterer, or whether it was being made by the charterer. Considering that the movement was one in which the barge herself had no interest and which it was the consignee's duty to make, that the consignee had started to make it without the master's assistance, and although subsequently relinquishing control of it to him was still actively assisting in it, and that the change of position was requested by the consignee and undertaken by the master only in pursuance of that request and in order to save the consignee expense, it seems to me, and I find, that the movement was being made on behalf of the consignee, and that the master, in directing it, acted for the consignee, and not for the vessel.

There must be a decree for the libelant for full damages, and the case must be referred to an assessor to state them. In stating them he should, if practicable, report how much of the total damages were caused by grounding on the rock and how much by the stranding out in the river.