**EASTERN MASSACHUSETTS STREET RY. CO. v. TRANSMARINE CORPORATION et al.**

**No. 2451.**

Circuit Court of Appeals, First Circuit.

June 30, 1930.

MORTON, District Judge, dissenting in part.

See, also, Transmarine Corporation v. Fore River Coal Co., 28 F.(2d) 624.

This is an appeal from a decree of the District Court for Massachusetts in favor of the libelant, the Transmarine Corporation, as owner pro hac vice of the steamship Surico in a libel in personam brought by it against the Fore River Coal Company, a Massachusetts corporation, in which action the Eastern Massachusetts Street Railway Company was impleaded by the coal company, the decree being against the Eastern Massachusetts Street Railway Company primarily and the Fore River Coal Company secondarily.

In the libel, after setting out that it was a New Jersey corporation engaged in operating and chartering steamships and was the owner pro hac vice of the steamer Surico, and that the Fore River Coal Company was a Massachusetts corporation, the libelant alleged: (1) That on or about the 31st day of January, 1927, it chartered to the coal company "the full coal-carrying capacity of the steamer Surico for two consecutive voyages from Hampton Roads, Virginia, to discharging berth alongside wharf of the Eastern Massachusetts Street Railway Company, Fore River, Quincy, in the State of Massachusetts, for the carriage of coal in bulk, respondent chartering to discharge the coal cargo free of expense to vessel, and vessel to be free of all wharfage charges, and expressly providing: 'Suitable berth and sufficient water guaranteed both at loading and discharging berths' "; (2) that while under charter the "Surico, on or about the 26th day of Feb., 1927, arrived with a cargo of coal from Norfolk, * * * for the respondent at Quincy, * * * and was there directed by the respondent to proceed, and did proceed, to said discharging berth alongside said dock of the Eastern Massachusetts Street Railway Company to discharge said cargo, where said steamer Surico and her crew put out lines and lay berthed as directed by respondent"; (3) that "on or about the second day of March, 1927, while the * * * Surico was lying so berthed and moored to said dock, the mooring bitts and bollards thereon to and by which the * * * Surico was made fast to said dock, gave way, pulled out, * * * thereby causing the * * * Surico to go adrift and come into collision with a lighter lying astern of said steamer; breaking the rudder * * * and seriously injuring and damaging said steamer"; (4) that the collision and damage "were not due to or caused by any fault or neglect on the part of the libellant or of the * * * Surico, but were wholly and solely due to the unsuitable discharging berth and the unsafe and unsuitable condition of said bitts and bollards and of said wharf for the mooring of said steamer thereat, and due to and caused by the negligence of the respondent and the breach by the said respondent of the terms of said contract of charter in directing said steamer to this dock and mooring her thereat, and in failing to furnish a safe and suitable discharging berth"; (5) that by reason of the going adrift and collision the steamship was damaged and demurrage was incurred; (6) that the libelant had performed all the conditions of the charter; (7) that the damage amounted to $11,367.64, "no part of which although duly demanded has been paid"; and (8) that "all and singular the premises are true and within the admiralty and maritime jurisdiction of the United States and of this Honorable Court."

The coal company in its answer admitted the allegations contained in paragraph (1), the allegations in (2), except that it denied that the lines were put out or said steamship lay berthed by direction of the respondent; of the allegations in (3), it admitted that the Surico broke adrift from the wharf and collided with the lighter, and that some damage was done, but denied the balance of the allegations therein contained; denied all the allegations in paragraph (4); left the libelant to prove the allegations in (5); denied the allegations in (6); of the allegations in (7) it admitted the demand, and that no part of the damages had been paid, but denied the balance of the allegations therein; and of the allegations in (8) it admitted that the cause was in the admiralty jurisdiction of the court, but denied that all and singular the premises were true.

And further answering the respondent alleged: (1) that when the steamer arrived at Quincy she had on board a cargo of about 4,800 tons of coal, part of which was consigned to the respondent, the balance to the Eastern Massachusetts Street Railway Company; that the steamer was berthed at the

wharf in Quincy, owned by the Eastern Massachusetts Street Railway Company, that she lay with her bow heading down stream in a northeasterly direction; that the lines put out from the Surico to the mooring bitts was done under the direction of the officers of the steamer and was at all times under the sole control of the Surico; that about 9.30 p. m. on March 2, while the steamer was lying alongside the dock, the northwest wind increased to an extraordinary and unusual velocity, 50 miles an hour, and caused the Surico to go adrift; that the breaking adrift and the damage resulting therefrom "were not caused or contributed to by any fault or neglect * * * of the respondent or by reason of any breach by the respondent of the terms of said contract of charter, but were due either to the exceptions of the act of God and/or dangers and risks of the seas, which were expressly excepted in said charter party, or to the fault and neglect of said steamer Surico and those in charge of her"; in failing to put out (1) a sufficient number of lines; (2) lines of sufficient strength; (3) properly to place and maintain the lines; (4) to put down additional lines, when the wind increased; (5) to maintain a proper watch; (6) to drop her anchor seasonably, etc.

In the petition of the coal company to implead the railway company, the petitioners set out the usual formal allegations as to citizenship, the bringing of the libel to recover damages sustained by reason of the Surico breaking away from her moorings at the wharf; and averred that the libel alleged that the steamer went adrift because the mooring bitts gave way and the damage was caused by "the unsafe and unsuitable condition of the said discharging berth."

It was further alleged that the petitioner was lessee from the railway company of certain space for the storage of coal adjoining the wharf where the Surico was lying, under a lease whereby the railway company agreed to unload such coal that might be delivered in vessels alongside said wharf for account of the petitioner; that the lease contained a covenant by the railway company "to maintain said berth for a period of two years, from date said premises are ready for occupancy by the lessee, in good condition to receive and accommodate vessels of approximately 6,600 tons capacity of a type similar to the steamers Bristol and Transportation recently discharged at this berth"; that the Surico was of that type and capacity and the covenant was in force at the times referred

to in the libel; that nearly half the cargo of coal on the Surico at the times referred to was owned by the street railway company and consigned to it as such owner, and discharged by it from the steamer on its own account; that so much of the cargo on board, as was the property of the petitioner, was discharged by the railway company; that the petitioner took no part in the discharge of any of the coal; and that it gave no directions as to how the steamer should be made fast.

It was further alleged that, irrespective of the lease, the railway company, as owner of the berth, was obliged to have and maintain it in a safe and suitable condition for the steamer Surico on the occasion in question, "as said steamer was invited to lie at said berth and there discharge her cargo, not only by the petitioner, but also by the * * * Railway Company, the latter being owner of a large part of said cargo which was being discharged by said steamer on said Railway Company's invitation at said berth for the account of said Railway Company"; that prior to March 2 (the date of the accident), all the petitioner's coal had been discharged; that the only coal then remaining on board belonged to the railway company; that before and at the time the steamer went adrift, the railway company was engaged in discharging its own coal, and that the petitioner had no interest in or control over the discharge; that if the steamer sustained damages because of any insufficiency or unsuitability of the berth, the railway company and not the petitioner was the party liable therefor; and that the matters alleged were true and within the jurisdiction of the court.

The railway company appeared specially and objected to the jurisdiction of the court on the grounds, among others: (1) That the petition did not state a proper cause for impleader; (2) that the railway company was not a party to the charter declared on in the libel; and (3) that the relation between the railway company and the petitioner was that of lessor and lessee, which contract was not a maritime one within the jurisdiction of the court.

These objections being overruled, the railway company filed an answer to the petition, reserving its rights under its special appearance; and also an answer to the libel. In its answer to the petition, among other things, it admitted that it leased certain space on the wharf to the coal company upon the terms and conditions contained in the lease, but denied that the lease was a maritime con-

tract; it admitted that part of the cargo of coal on the steamer belonged to it, was being discharged for its account, and that such of the cargo as belonged to the coal company had been discharged before the vessel went adrift, but denied that it gave any directions as to how the steamer should be tied up or discharged, that she was in the berth at the wharf on its invitation, or that it was liable for any damage the steamer sustained; it also denied the allegations "that all and singular the premises are true and within the jurisdiction of the * * * court."

In its answer to the libel, it admitted that the Surico, on the 26th of February, 1927, arrived with a cargo of coal for the coal company and berthed alongside its wharf; it admitted that on the 2d of March, while berthed at the wharf, the Surico broke adrift and collided with the lighter, but denied the other allegations in the libel; denied that the alleged injury and damage was caused or contributed to by any fault or neglect on its part; and alleged that the same was due to an act of God or inevitable accident, or to the fault and neglect of the steamer and those in charge of her.

In the District Court it was found that the vessel was properly moored to the wharf; that under the charter party the coal company contracted to furnish the libelant a proper berth, which it failed to do; and, in any event, the coal company was liable. As to the railway company's liability, it found that the pulling out of the block of granite from the wall, in which block was fastened the bitt to which the two breast lines leading from the vessel's bow were attached, was evidence of negligence; and that, having failed to show that the wall had been built with due care and had been properly inspected, the railway company was liable. Having made these findings, it entered the decree above spoken of, from which this appeal was taken.

In its assignments of error Nos. 1, 2, 3, 4, and 5, the railway company complains that the court erred in holding that the coal company was entitled under Admiralty Rule 56 (28 USCA § 723) to implead the railway company; in overruling the railway company's exceptions to the petition, and taking jurisdiction of the claim against it; in No. 6, in admitting the lease in evidence; in Nos. 7 and 15, in finding that the vessel was properly moored to the wharf and in failing to find that the berth was a proper one; in No. 8, in finding that the vessel was not furnished with a proper berth; in Nos. 9, 10, and 11, in holding that the pulling out of the block of granite was evidence of negligence; that it owed a duty to see that the dock was properly arranged and failed in that duty, in that it did not show that it exercised due care in building and inspecting the wall; in Nos. 12 and 13, in entering the decree that the railway company was primarily and the coal company secondarily liable; in Nos. 16, 17, 18, 19, 20, and 21, in failing to find that the vessel and those in charge of her were not in fault either in properly placing or maintaining the lines, in maintaining a proper watch, and in not taking seasonable and proper precaution to prevent the vessel from going adrift; in failing to find that she was docked and lay berthed in an improper manner; and in finding that the breaking adrift of the vessel was due to the fault or neglect of the railway company, and not due to causes or conditions for which it was not liable; and in Nos. 24 and 25, in entering a decree against the railway company.

It appeared that the coal company had contracted to sell coal to the railway company to be delivered at its wharf at Weymouth; that on the trip in question the Surico had on board 4,849 tons of coal, 2,698 tons of which were for the coal company, and 2,150 tons for the railway company, which was the coal it had purchased from the coal company; that the wharf of the railway company was located on the west bank of Fore river and the south bank of Old Town river at their junction; that a granite wall ran along the Fore river side of the property, and about 150 feet along the Old Town river side; that the wharf was located on the wall along the Fore river side, having a wooden bulkhead which at either end did not extend to the ends of the wall; that it had a stationary tower, located midway between the ends of the wooden portion of the wharf, equipped with hoisting apparatus for unloading vessels; that the wall at the north, or Old Town river end, extended about 50 feet farther north than the bulkhead or wood portion of the wharf; that the railway company employed a stevedore to discharge the vessels at the wharf, who was in charge of the unloading on the night in question; that the Surico was about 324 feet long and 25 feet deep; that she had five hatches, Nos. 1 and 2 being forward, Nos. 4 and 5 aft, and No. 3 located amidships; that, the tower being stationary, vessels on being discharged had to be moved back and forth to bring the dif-

ferent hatches opposite the tower and within reach of the unloading apparatus; that to accomplish this movement there was a steam winch near the tower that operated two cables over a drum, the end of one being made fast to the vessel about at No. 2 and the other about at No. 4 hatch; that on February 26 the Surico docked at the wharf, heading north, or down stream, with her port side to the wharf, and was made fast by lines put out under the supervision of the officer in charge of the vessel; that the lines (all of which were new seven-inch Manila lines) consisted of two breast lines, that led from the bow of the vessel to an iron bitt secured in the third granite block from the corner of the wall and on the Old Town river side; also of two stern breast lines that led from the stern chocks of the vessel to bitts set in the granite wall at its south end; also of a forward spring line and an aft spring line, the forward spring line leading from the forward deck to an iron bitt near the north end of the wood part of the wharf and the aft spring line leading from the aft deck to another bitt on the south end, the wood part of the wharf; that on the night of March 2 all the coal was discharged, except 300 or 400 tons, all of which belonged to the railway company; that about 8.30 that evening, the coal in the aft part of No. 4 hatch having been removed, the vessel was moved back to enable the digger to remove the remaining coal from the forward part of the same hatch; that during the evening the wind had been blowing a strong breeze from the northwest and between 10 and 10.40 was blowing from 40 to 48 miles an hour; that the tide was flood during the night and rose to the height of eleven feet at about 10.45; that while this coal was being removed, at about 10.40, the vessel went adrift, the bow breast lines disappearing; that as the vessel swung away from the wharf, the fore or bow spring line pulled over the bitt to which it was attached and slipped off; that as the vessel continued to swing, the aft spring line and aft breast lines parted; that as they did this, the vessel went astern and collided with a lighter moored behind her, breaking her propeller; that, upon discovering the situation, anchors were dropped from the vessel, she swung across the river and was brought up and made fast at a wharf on the opposite side of the river; that the next morning it was ascertained that the breaking away of the vessel from the wharf was due to the fact that three of the large granite blocks, which together weighed 29,400 pounds, one being the block to which

the bow breast lines were made fast, had been pulled into the river, allowing the breast lines to slip off the bitt; that the bitt to which the bow spring line was made fast had been pulled over, allowing the spring line to slip off; that the granite blocks that were pulled off the wall had been cemented on the under side to the second tier of granite blocks, and that, in pulling off the three upper ones, a granite block in the second tier at the corner of the wall was partly pulled out, so that it overhung about a foot.

Fitz-Henry Smith, Jr., of Boston, Mass., for appellant.

Eugene P. Carver, Jr., of Boston, Mass., and Carroll Single, of New York City (Carver & Schell, of Boston, Mass., and Single & Single, of New York City, on the brief), for appellee Transmarine Corporation.

Albert T. Gould and Edward A. Neiley, both of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellee Fore River Coal Co.

Before BINGHAM and WILSON, Circuit Judges, and MORTON, District Judge.

BINGHAM, Circuit Judge (after stating the facts as above).

We are satisfied that, on the evidence, the District Court did not err in finding the libelant was not at fault either in the manner or the means it employed in tying up the vessel to the wharf, or otherwise; that her breaking away was not due to an act of God or any unusual circumstance, either in the character of the weather or of the tide, that could not reasonably have been foreseen and provided against; that the coal company broke its covenant to provide a proper and suitable berth, in that the one provided was unsuitable; and that it was liable, independently of whether it was negligent or not in failing to ascertain that the berth was unsuitable.

We are also of the opinion that the railway company was properly impleaded under Admiralty Rule 56; that its covenant in the lease wherein it contracted to "maintain said berth * * * in good condition to receive and accommodate vessels" of the capacity and type stipulated, with which the Surico complied, rendered the railway company liable over to the coal company, if the wharf was unsuitable; and that its contract to maintain a safe berth was a maritime contract, the provisions of which, so far at least as this case is concerned, could be enforced

in an admiralty court without regard to and independently of the other provisions of the lease; that, as its contract contemplated that the coal company would invite vessels of the type and capacity of the Surico to berth at the railway company's wharf, it was an express or implied agreement that, if the coal company did invite such vessels, it would maintain for them a suitable berth. The berth being found to be unsuitable, it breached its contract with the coal company and became liable over to it, irrespective of whether it was negligent, as the District Court found it was; and being impleaded and found in default in regard to the very matter as to which the coal company was found liable and in default to the libelant, the District Court, by reason of the railway company's liability over to the coal company, and rule 56, was authorized to enter the decree that it did, holding the railway company primarily liable; for Rule 56 provides: "That such further proceedings shall be had and decree rendered by the court in the suit as to law and justice shall appertain." In this situation law and justice required that the decree entered should hold the railway company primarily and the coal company only secondarily liable.

Rule 56 in admiralty provides: "In any suit * * * in personam the * * * respondent * * * shall be entitled to bring in any other * * * person (individual or corporation) who may be partly or wholly liable * * * to such * * * respondent by way of remedy over, contribution or otherwise, growing out of the same matter. This shall be done by petition, on oath, presented before or at the time of answering the libel, or at any later time during the progress of the cause that the court may allow. Such petition shall contain suitable allegations showing such liability [by way of remedy over, contribution, or otherwise], and the particulars thereof, and that such other * * * person ought to be proceeded against in the same suit for such damage, and shall pray that process be issued against such * * * person to that end. Thereupon such process shall issue, and if duly served, such suit shall proceed as if such * * * person had been originally proceeded against; the other parties in the suit shall answer the petition; ° * * such new party shall answer the libel; and such further proceedings shall be had and decree rendered by the court in the suit as to law and justice shall appertain."

[5] This case falls clearly within the rule, if the covenant of the railway company, wherein it agreed that it would maintain a suitable berth at its wharf, was a maritime contract and could be enforced independently of the other provisions in the lease. The covenant related to the same subject-matter as did the coal company's covenant with the libelant, for the berth in controversy under both covenants is the same. If the covenant in the charter is maritime, the one in the lease is equally so. Indeed, there can be no doubt that both are maritime. In re Easton, 95 U. S. 68, 24 L. Ed. 373. Each covenant is as broad as the invitation given, and includes the facilities (the bitts) provided for tying up the vessel to the wharf. Dougherty Co. v. Bader Coal Co. (D. C.) 244 F. 267. As an independent suit could have been maintained on the railway company's covenant to maintain a suitable berth [Compagnie Francaise de Navigation a Vapeur v. Bonnasse et al. (D. C.) 15 F.(2d) 203, 204]; it presents a clear case for impleading under the rule. It is undoubtedly true that, where an instrument embodies a contract containing provisions, some of which are maritime and some nonmaritime, which are so interrelated as to be indivisible and to render a separate adjustment of those that are maritime impracticable, admiralty will not take jurisdiction. But where the respective provisions of the contract are divisible and the maritime obligations may be separately adjudicated, admiralty may take jurisdiction and enforce them. This question has been recently passed upon by the Court of Appeals in the Second Circuit, in Compagnie Francaise de Navigation a Vapeur v. Bonnasse et al. (Irving Bank-Columbia Trust Co., Garnishee), 19 F.(2d) 777, 779. It was there contended, as it is here, "that a contract to be within the jurisdiction of the admiralty must be wholly maritime." In answer to this contention, the court said at page 779 of 19 F.(2d): "The rule has at times been so stated in the books, and the statement is usually not misleading. Grant v. Poillon, 20 How. 162, 15 L. Ed. 871; The Ada, 250 F. 194 (C. C. A. 2); The Pennsylvania, 154 F. 9 (C. C. A. 2). The reason for it is plain enough. A contract both maritime and nonmaritime is ordinarily indivisible, so that the rights of the parties cannot be adjusted separately, those maritime in the admiralty, and the rest elsewhere. Admiralty must refuse to assume any jurisdiction over it at all, because it must either ignore the principles of the law of contract, or extend its powers beyond their constitutional scope. But in so far as the maritime obligations may, consistently with those principles,

be separately adjudicated, there is no objection to the jurisdiction of the admiralty pro tanto. This is clearly intimated in Turner v. Beacham, Fed. Cas. No. 14,252, and The Pennsylvania, 154 F. 9 (C. C. A. 2), though the decision did not require such a holding. The mere fact that the contract covers a subject-matter of both kinds is not therefore decisive; that would make the mere form control. The substantial question is whether the maritime obligations can be separately enforced without prejudice to the rest." In this case certiorari was denied. See American Exch. Irving Trust Co. v. Bonnasse, 275 U. S. 551, 48 S. Ct. 114, 72 L. Ed. 421.

Chief Justice Taney, sitting as Circuit Justice, in Turner v. Beacham, supra, stated the rule as follows: "And I consider it to be a clear rule of admiralty jurisdiction, that although the contract which the party seeks to enforce is maritime, yet, if he has connected it inseparately with another contract over which the court has no jurisdiction, and they are so blended together that the court cannot decide one, with justice to both parties, without disposing of the other, the party must resort to a court of law, or a court of equity, as the case may require, and the admiralty court cannot take jurisdiction of the controversy. The case of Grant v. Poillon was decided upon this ground, at the last term of the supreme court."

The Grant Case does not militate against the position here taken. In that case, the libelants, owners of the ship, brought an action on a contract of affreightment to recover the freight, against the shippers, a partnership. One of the owners was a partner in the defendants' firm. To give full relief an accounting between the partners was necessary. This admiralty could not give, and for this reason jurisdiction was declined.

In Aktieselskabet Fido v. Lloyd Braziliero (C. C. A.) 283 F. 62, the contract, with reference to which the respondent sought to implead the third party, was a contract of purchase and sale of coal for stiffening, a purely nonmaritime contract which was solely within the jurisdiction of a court of common law, and all that case really decided was that the third party could not be impleaded under Rule 59, now Rule 56, on such a contract, a question we are not called upon to consider.

The other cases cited and relied upon by the railway company as to this question are of like character and need not be further commented upon.

The covenant of the railway company, although contained in a lease, was not inseparately connected with its other provisions, so that a court of admiralty could not decide the controversy here raised on the covenant, without disposing of other provisions in the lease.

The lease was properly admitted in evidence. It contained the covenant that fixed the responsibility of the railway company to the coal company, and disclosed the right of the coal company to invite vessels, of the class and type in question, to berth and discharge at the wharf.

The decree of the District Court is affirmed, with costs to the appellees.

MORTON, District Judge (dissenting).

On the question of pleading I concur in the result.

The case really turns on whether the accident was caused by carelessness in tying up the steamer, or by a defective condition of the wharf, or by both. These points are not discussed either in the opinion of the District Judge or in that of this court. The Surico, in breaking away, pulled bodily off the top of the wharf the stone to which the mooring bit was attached and two other stones in front of it, the three having a combined weight of about fifteen tons; a stone under these, the weight of which is not given, was moved out about a foot. All these stresses, it will be noticed, were outward, i. e., towards the river. But heavy stresses in the opposite direction were also involved. The cap log of the wharf, which was twelve inches square, was backed by heavy planking laid endwise to it. After the accident it was found that the cap log had been pushed up about ten inches, and the ends of the planks behind it had been "crushed" back and splintered upwards. As the wind blew from the wharf toward the vessel it does not account for pressure against the wharf. The highest estimate of its velocity was from forty to forty-eight miles per hour; there is no claim that it was of unprecedented, or even of extraordinary, severity. I find great difficulty in believing that it was capable of exerting sufficient force to drag off the wharf these heavy stones which had held many larger vessels. Moreover, such an explanation of the accident in no wise accounts for the "crushing" of the cap log and the adjoining planks; that damage was evidently done by a force acting inward against the wharf and the wind.

The correct explanation of an accident, as well as of a crime, must necessarily be consistent with all established facts. The libelant's interpretation of what occurred, viz., that the steamer broke adrift from the mere pressure of the wind, which was accepted in the District Court and is approved without discussion in the majority opinion, ignores entirely the crushing of the wharf, and is inconsistent with that fact. The suggestion offered by the street railway company is that the steamer was tied up too short on a rising tide; that her lifting with the tide and with the removal of cargo shortened the lines and brought her solidly against the wharf; that as she continued to lift the stresses involved became extreme and were finally resolved by the "crushing" of the wharf, the forcing up of the cap log, and the pulling out of the stones to which the bow line was fastened. This explanation of the accident harmonizes all the established facts and is supported by many things in the testimony. The lines were last tended at 8:30. After that the tide rose more than two hours before the accident; and it rose a foot and one-half higher than was normally expected. The unloading of cargo which was going on also lifted the vessel. She broke away just at the top of the tide. There was no noticeable increase in the wind to account for the accident just at that time.

The mooring may have pulled loose, either because the wharf was unsuitable, or because the vessel was improperly tied to it in such a manner as to produce extraordinary strain on her lines. But for the contrary view of my associates, I should think it too clear for argument that under these circumstances the principle of res ipsa loquitur on which the District Judge relied had no application, and that the happening of the accident afforded no inference that the wharf was unsafe or improper. On this point the case is curiously similar to Girard Point Storage Co. v. Roy, 93 F. 574 (C. C. A. 3d), where the failure of a mooring post was held not evidence of negligence. The weight of the District Judge's finding is greatly diminished by the fact that it was based on the view that the failure of the mooring to hold was itself evidence of negligence on the part of the wharf owner. We should examine the testimony and arrive at our own conclusions. It seems to me clear that something more than the force of the wind entered into the accident, i. e., that the vessel was negligent as to her mooring lines. I incline to think that she was solely at fault; but as my breth-ren do not think that she was at fault at all, it is unnecessary for me to express a definite opinion on that point.