**BERWIND–WHITE COAL MINING CO. v.**
**CITY OF NEW YORK et al.**

**THE EUREKA NO. 72.**

**THE ADMIRAL DEWEY.**
No. 168.

Circuit Court of Appeals, Second Circuit.
April 30, 1943.

444

William C. Chanler, of New York City (Martin Faust and John D. J. Moore, Jr., both of New York City, of counsel), for respondent-appellant.

Clive C. Handy, of New York City (Gerald E. Dwyer and S. A. Hellenbrand, both of New York City, of counsel), for respondents-impleaded-appellees.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The libellant's coal barge Eureka No. 72 was sunk when she grounded on submerged piles at the north side of Pier 99, Hudson River, on March 3, 1939. It sued the City of New York, in the admiralty of the District Court for the Southern District of New York, as owner of the pier. The city impleaded both the tug Admiral Dewey, owned by the libellant, and since the latter owned that tug it was stipulated that any negligence of the tug should be imputed to the Eureka No. 72, and the New York Central Railroad Company which owned the land under water immediately adjacent to the pier on the north and had until recently had a track trestle there. The railroad company thereupon impleaded the George W. Rogers Construction Company which had, under a contract it had with the railroad company, removed the trestle about a month before the sinking. The Rogers Company had in this contract agreed to indemnify the railroad and save it harmless from any claim resulting from any act or omission of the contractor or those acting for it in the removal of the trestle.

After trial in the district court, an interlocutory decree was entered against the City of New York and the petitions impleading the New York Central Railroad Co. and the George W. Rogers Construction Co. were dismissed on the merits. The city has appealed and the libellant has assigned error to so much of the decree as dismissed the petitions against the impleaded respondents. The facts as found are not challenged. The appellant does, however, insist that it was not a general wharfinger and that it was not negligent.

Late in the afternoon of March 3, 1939, libellant's tug, Admiral Dewey, moored the loaded coal barge Eureka No. 72 at the north side of the pier and left when, so far as appears, it had no reason to believe the berth unsafe. At about 10:30 P. M. on the same day the barge settled with the

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for libellant-appellee.

fall of the tide on two submerged piles which so damaged her bottom that she sank.

From sometime in 1905 or 1906 until February of 1939 the New York Central had maintained the track trestle above mentioned along the north side of the pier on piles driven into the land, which was owned by the railroad, beneath the water there. The railroad had done so under a permit pursuant to an agreement it made with the city on October 10, 1905 which required it to remove the trestle immediately upon the termination of a lease it then had of the pier and to restore "said pier and land under water adjacent thereto on the northerly side thereof to its former state and condition."

Before the removal of the trestle, the appellee barges had, with other vessels, frequently been moored to the north side of the trestle not only without objection from anyone despite a sign on the river end of the pier reading "No Berthing Allowed At This Pier" but the city had on occasions collected from the libellant wharfage for those moorings. Apparently the libellant paid wharfage whenever it was billed for it. It has been urged in behalf of the city that it was unable to prevent the mooring of vessels at the north side of the trestle which was owned by the railroad that owned the land under water as well. However that may have been, it is presently immaterial since the city did in fact exercise control and hold itself out as a wharfinger there by collecting wharfage. All of which justified the conclusion of the trial judge that the libellant did, despite the sign, reasonably believe that the north side of the trestle was a safe and available berth.

When the trestle was removed by the railroad company it was done in compliance with an order of the city given March 10, 1938 and the Rogers Construction Co. was employed by the railroad to do the work. It may be assumed that the lease had expired and it appears from a letter dated September 22, 1938, written by the Commissioner of Docks to the railroad that immediate compliance with the order for removal was insisted upon because the trestle was a fire hazard.

There was no evidence as to the condition of the submerged land adjacent to the north side of the pier before the building of the trestle. It was shown that the Rogers Construction Co., which had agreed to remove the trestle in a proper and workmanlike manner and to remove four pile clusters immediately adjacent thereto on the north, had swept the bottom six times after the trestle was taken down in an effort to discover any obstructions there but these sweepings did not reveal the submerged piles which later caused the sinking of the libellant's barge. The city, however, had before the sinking and upon the request of the railroad acknowledged that it was satisfied with the work which had been done "in connection with the removal of the railroad trestle." And it did so without making an inspection of the bottom of the slip.

■■ That the trial judge was right in holding that the city became a general wharfinger by permitting vessels to use the north side of the trestle for mooring purposes and by collecting wharfage from the libellant for such use from time to time is clear enough. The Santa Barbara, 4 Cir., 299 F. 147. Nor can it be said that by the removal of the trestle the city's status in this respect was changed when the slip was thus enlarged. The pier was still there and there was nothing to warn vessels that the waters adjacent to the north of it were not still safe and available for berthing. The city knew that the berth at its pier had been widened; was bound to know whether the change had made it unsafe; and, if so, to give adequate warning to those who might otherwise tie up there. Heissenbuttel v. Mayor, etc., of New York, D.C., 30 F. 456; The Cornell No. 20, D.C., 8 F.Supp. 431. Its neglect to do that was a breach of the duty it as a general wharfinger owed the libellant.

■ It is well settled that a general wharfinger is not an insurer but that he must use reasonable diligence in providing a safe berth; and that that requires the taking of reasonable precautions to remove under water obstructions that might otherwise endanger the vessels moored to his pier. Smith v. Burnett, 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756; Norfolk Tidewater Terminals, Inc., v. Wood Towing Corp. et al., 4 Cir., 94 F.2d 164. It may be that the city could have fulfilled this duty by engaging a competent contractor to perform the work of making the bottom safe. We need not decide that for it did not do so. The railroad's contractual obligation to the city was only to restore the bottom to its condition previous to the construction of the trestle. There is no

proof as to the former condition of the bottom and consequently none that the slip was then safe for use as a berth for barges. So the city had no right to treat the work of the railroad's contractor as reasonably sufficient to make the bottom safe. And unless some adequate excuse was shown for its failure to inspect enough to discover that the bottom was in fact foul it was negligent in not so doing and making whatever changes were thus shown to be needed before vessels were allowed to use the slip unwarned of the hidden danger. Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 48 F.2d 105.

■ It has been argued that the railroad's ownership of the land adjacent to the pier gave it such control over the bottom of the slip that the city might not have been able to control its condition. See, Appleby v. City of New York, 271 U.S. 364, 400, 401, 46 S.Ct. 569, 70 L.Ed. 992. Assuming, without deciding, that to have been so until and unless the city acquired additional rights in some way, it does not relieve the city from its obligations as a general wharfinger so long as it held itself out as such. If for any reason the city was unable to take suitable steps to determine whether this was a safe berth, it could, and should, have taken adequate steps to prevent the continuance of its use for mooring. Daly v. New York Dock Co., 2 Cir., 254 F. 691; Hirsch Lumber Co. v. C. Ottaviano & Co., 2 Cir., 18 F.2d 952; Nassau Sand & Gravel Co. Inc. v. Red Star Towing & Transportation Co., Inc., 2 Cir., 62 F.2d 356. The liability of the city for the damage done was accordingly established and the interlocutory decree was without error in that respect.

■ The trial judge was clearly right in finding that the tug Admiral Dewey was not negligent in leaving the barge at this berth since it neither knew nor had reason to know that the bottom of the slip was foul. The Eastchester, 2 Cir., 20 F.2d 357.

The libellant now disclaims, provided the city is held liable, any reliance upon its assignments of error directed to the dismissal of the petitions which brought in the two respondents under the 56th Rule. The issues thus raised must be decided, nevertheless, to determine whether the court had jurisdiction to dismiss the petitions on the merits; and, if so, whether such a dismissal was supported by the record.

■ On the last proposition there can be no doubt. Neither of the impleaded respondents were wharfingers at the pier; neither owed the libellant any duty to maintain the slip in a safe condition for use; and neither owed that sort of duty to the city. The railroad was bound by contract with the city to restore the bottom of the slip to its former, and now unknown, condition. The construction company was bound by contract to the railroad to do that and indemnify and to save the latter harmless because of what was done or omitted, in the removal of the trestle and the restoration of the bottom. If, therefore, the railroad is not liable to any party to this suit neither is the construction company. As it clearly appears that the railroad fully performed its contract with and to the satisfaction of the city, the dismissal of the two petitions was without error provided the court had jurisdiction. That in turn depends upon whether the railroad's contract was maritime.

■ The admiralty jurisdiction of the federal courts embraces two principal subjects—maritime contracts and maritime torts. The latter, which may for present purposes be disregarded, are civil wrongs committed on navigable waters. The place where torts are committed, and not their nature, is decisive on the question of admiralty jurisdiction. The Belfast v. Boon, 7 Wall. 624, 637, 19 L.Ed. 266. On the other hand it is the nature of contracts which controls on the question of admiralty jurisdiction. The rule in this country was broadly stated in The Belfast v. Boon, supra, as follows: "Contracts, claims, or service, purely maritime, and touching rights and duties appertaining to commerce and navigation, are cognizable in the admiralty." Where then the subject matter of a contract relates entirely to navigation and commerce on navigable waters admiralty jurisdiction is clear enough. Edwards v. Elliott, 21 Wall. 532, 22 L.Ed. 487; New England M. Ins. Co. v. Dunham, 11 Wall. 1, 20 L.Ed. 90; The Richard Winslow, 7 Cir., 71 F. 426. That is not, however, the situation here. The railroad's agreement was made in connection with its application to the city for a permit to construct a track trestle to carry its road-bed to its leased pier. The contract was obviously not maritime in so far as it was in aid of the railroad's application for a permit to extend its track and maintain it on, and by means of, the trestle. Even

though the trestle did extend over navigable waters it did so only as the support of the railroad's right of way so extended. It was built upon the land and the part of the right of way so constructed was but part of a road-bed used for traffic on land. This made at least a substantial portion of the subject matter of the agreement non-maritime.

■ But there was another part of this agreement which required the restoration of the bottom of the slip to its former condition whenever the trestle should be removed. That dealt with the maintenance of a slip in navigable waters and involved whatever work was needed to make the bottom as it once had been. That part of the agreement was therefore maritime. Compare, In re Hydraulic Steam Dredge No. 1, 7 Cir., 80 F. 545.

■ The agreement was, then, at most one having its subject matter of a nature not wholly maritime. Generally speaking it would, under long well established principles, not be within the admiralty jurisdiction at all. The Pennsylvania, 2 Cir., 154 F. 9; Grant v. Poillon, 20 How. 162, 15 L.Ed. 871. That is to say, it would not be cognizable in admiralty in respect to any of its subject matter which was not maritime and when the maritime subject matter of a contract cannot be separated from the non-maritime the general rule as above stated takes effect. Yet that is not always controlling for there is a well known class of contracts which form an exception to this general rule of all maritime subject matter or no admiralty jurisdiction. This class comprises mixed contracts whose maritime subject matter is capable of being divided from the rest so that the rights of the parties which flow from the non-maritime part of the contract may be, if necessary, litigated separately and only that part which is maritime be put in issue in the admiralty suit. For one example of this sort of admiralty jurisdiction in a suit on a mixed contract see Compagnie Francaise de Navigation a Vapeur v. Bonnasse et al., 2 Cir., 19 F.2d 777. For another see, Eastern Massachusetts St. R. Co. v. Transmarine Corp., 1 Cir., 42 F.2d 58. The case just mentioned is very close to the instant one. There the owner of a wharf had leased it with a covenant requiring it to maintain the berth in safe condition for navigation. The lessee of the wharf had chartered a vessel for which it was bound to provide a safe berth. It provided the berth at the wharf it had leased and, because that was foul, the vessel was damaged. Upon being sued in admiralty for the damages to the vessel, the charterer impleaded the lessor of the wharf in reliance upon the covenant in the lease running to it as the lessee. The covenant to maintain the wharf in safe condition was held separable from the other provisions in the lease and jurisdiction of the petition to implead the lessor was consequently upheld. Here we think the agreement to restore the bottom of the slip to its former condition was likewise separable from the agreement to remove the trestle. That could have been removed simply by taking down and out the material of which it was composed. So it appears that the restoration of the bottom of the slip was in addition to what was required simply to remove the trestle. It was accordingly separable from the part of the agreement pertaining to the removal itself. That being so the court below had jurisdiction pro tanto and the dismissal on the merits of the petitions impleading the respondents was within that jurisdiction.

Decree affirmed.